[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13265; 17-13330
_____

D.C. Docket No. 1:16-cr-20908-JAL-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RENADO SMITH,
RICHARD DELANCY,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(July 2, 2019)

Before ROSENBAUM, HULL and JULIE CARNES, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, defendants Renado Smith and Richard Delancy appeal

their convictions for conspiracy to commit alien smuggling, alien smuggling, and

1

attempted illegal reentry.  Both defendants argue that at trial the district court erred in admitting the videotaped deposition testimony of passenger Vanessa Armstrong Vixama, a smuggled alien in their boat.  Smith also argues that the prosecutor's improper comments to the jury during closing argument warrant a new trial.  After careful review of the record and the parties' briefs, and with the benefit of oral argument, we affirm Smith and Delancy's convictions.

## I. TRIAL EVIDENCE

We recount the overwhelming trial evidence of alien smuggling in this case.

For starters, on November 4, 2016, defendants Smith and Delancy, both Bahamian nationals, set out from Freeport, Bahamas on a 24-foot Grady White boat with 21 passengers.  Smith was the operator of the vessel, and Delancy assisted him.

Of the 21 passengers on the boat, 20 were Haitian nationals, including Vixama, and one was a Bahamian national.  Sometime after leaving Freeport, this small boat ran out of fuel and drifted at sea for approximately six days.  There was little water and no food on the boat.

Fortunately for the passengers, on November 9, 2016, a U.S. Customs and Border Protection ("CBP") aircraft, conducting a routine border security patrol, spotted the boat drifting about 24 miles off the coast of Key Largo, Florida.  The boat was also about 24 miles to the southwest of Bimini, Bahamas and was drifting

2

in a northerly direction with the Gulf Stream current.  The CBP aircraft personnel notified the U.S. Coast Guard of the boat's position and continued to monitor the boat from the air until a Coast Guard vessel arrived.

A Coast Guard cutter was dispatched to the boat's location and used a small boat to ferry passengers from the disabled boat to the cutter.  The passengers, who were tired and dehydrated but otherwise in good health, were eager to leave the disabled boat.  Smith and Delancy, however, asked Coast Guard personnel to supply the two of them with water and fuel to continue their trip.  A Coast Guard officer advised them that the Coast Guard could not provide them with fuel, and Smith and Delancy agreed to board the cutter.

At the time, Smith and Delancy claimed that they were taking the passengers to Bimini, Bahamas.  Coast Guard officers testified, however, that they were skeptical of the defendants' claims because they "didn't make sense."  The officers explained that the boat was found south of Bimini, approximately halfway between Bimini and Key Largo.  Because the current in that area generally travels north, it would not make sense for the boat to have drifted south past Bimini after becoming disabled.  Both officers acknowledged, however, that because the boat had been adrift for six days, it would be difficult to determine what the boat's original route had been.

3

The CBP aircraft pilot who located the boat testified that, in his experience, vessels traveling from the Bahamas to the United States do not always take a straight route and sometimes take evasive actions to "disguise exactly what they're doing." Similarly, Homeland Security Investigations ("HSI") Agent Craig Nowicki, the case agent, testified that people involved in smuggling aliens "find various routes to avoid law enforcement detection."

The Coast Guard processed all 23 people who were taken off the boat (including Smith and Delancy). None of the 21 passengers had any identification documents with them, nor did they have permission to enter or reside in the United States. Smith and Delancy both were previously removed from the United States and did not have permission to reenter.

In addition to the location of the boat, there was other considerable evidence showing that the defendants were bringing the aliens to the United States, not Bimini. For example, this was not even the defendants' first attempt to illegally enter the United States. Smith had a prior June 2013 conviction for alien smuggling for profit, and Delancy had a prior November 2013 conviction for illegal reentry after deportation. As discussed later, the first page of each judgment of conviction was admitted into evidence at trial. Among other things, those judgments reflected: (1) that both defendants' prior convictions took place in the West Palm Beach Division of the Southern District of Florida; (2) the dates of each

4

defendant's prior offense and conviction; (3) the statute under which each defendant was convicted; and (4) the nature of the offense.

Two of the boat's passengers also testified they believed the boat was headed to the United States. Specifically, two passengers gave videotaped depositions that were played for the jury and admitted into evidence at trial. As discussed in greater detail below, the defendants did not object to the admission of one passenger's deposition (that of Davidson Francois), but did object to the other (that of Vanessa Armstrong Vixama). We review what Francois said first.

Passenger Davidson Francois testified that he is from Cap-Haitien, Haiti. In 2016, Francois left Haiti and traveled to Freeport, Bahamas. After arriving in Freeport, Francois's father told him that a trip was being planned to bring Francois to the United States so that Francois could go to school. A few months later, in November 2016, Francois boarded the defendants' boat and left Freeport with about 21 other passengers. Francois testified that it was night time when he boarded the boat and that Smith drove while Delancy "help[ed] out." After leaving Freeport, the boat got lost and spent six days at sea.

Francois expressly testified that other passengers on the boat said they were headed to the United States, and Francois likewise believed the boat was going to the United States. Francois admitted, however, that he did not personally know where the boat was heading when he left Freeport because the defendants "didn't

5

tell [the passengers] anything."  Notably though, Delancy did discourage the passengers from waving at other boats or using their cell phones.

Specifically, during those six days, Francois saw several other boats pass by. One boat stopped and provided them with bread and water, but no other boats came to their aid.  But when the passengers attempted to get the attention of the other boats that were passing, Delancy told them not to wave at the other boats or attract their attention "because we don't know what kind of boats they are." Delancy also told the passengers to turn their cell phones off during the trip and that he did not want them using their phones for any reason.  Some of the passengers did attempt to use their phones but were unable to get a signal at sea.

While Francois's testimony was admitted without objection, the defendants objected to the government using the videotaped deposition of passenger Vanessa Armstrong Vixama, who also was from Haiti.  Vixama's testimony was strikingly similar to Francois's.  Vixama traveled to Freeport, Bahamas from Haiti in April 2016.  Her plan was to travel then from the Bahamas to the United States illegally, as she previously had applied for and been denied student visas to the United States on three separate occasions.  A friend of Vixama's mother arranged the trip for Vixama, and Vixama's family paid $5,000 for her passage.

Late one night in November 2016, Vixama got on a boat in Freeport with 20 to 22 other people to come to the United States.  Vixama testified that she believed

6

she was going directly from Freeport to Miami, and one of the defendants told her it would be about a three-hour trip. Smith drove the boat while Delancy held a GPS device and talked to Smith.

After leaving Freeport, the boat got lost and ran out of gas. When a fishing boat passed by, the passengers pooled their money to buy gas so they could continue their trip. There was no food on the boat, and they ran out of water after the first day at sea.

Vixama and other passengers had cell phones with them on the boat and attempted to use them while the boat was lost, but could not get any signal. When Delancy noticed the lights from their phones, he told the passengers to turn their phones off when other boats were going by. Vixama guessed that this was "so that the police wouldn't see us." Initially, Delancy also told the passengers not to wave their life jackets in the air to attract the attention of other boats, but by their sixth day lost at sea, Delancy relented and the passengers used the life jackets to attract the attention of the Coast Guard cutter, which rescued them after their six days at sea with little food or water.

## II. PROCEDURAL HISTORY

### A.   Indictment

A federal grand jury indicted both Smith and Delancy on (1) one count of conspiracy to encourage and induce an alien to come to, enter, and reside in the

United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and will be in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) (Count 1); and (2) 21 counts of knowingly encouraging and inducing an alien to come to, enter, and reside in the United States, knowing and in reckless disregard of the fact that such coming to, entry, and residence is and will be in violation of law, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv), (v)(II) and 18 U.S.C. § 2 (Counts 2-22).  The grand jury also charged Smith and Delancy with one count each of attempted illegal reentry, in violation of 8 U.S.C. § 1326(a), (b)(2) (Counts 23 (Delancy) and 24 (Smith)).  Both defendants pled not guilty and proceeded to trial.

## B.    Material Witness Complaint Against Vixama

Many of the aliens on the boat were never brought into the United States, but were sent back to Haiti after being processed by the Coast Guard.  However, four aliens, including Vixama and Francois, were brought into the United States to be interviewed in connection with Smith and Delancy's criminal conduct.  Initially, Vixama was detained in Immigration and Customs Enforcement ("ICE") custody at the Broward Transitional Center.

In December 2016, Agent Nowicki met with Vixama while she was in immigration detention at the Broward Transitional Center.  During that meeting, Vixama was anxious and provided Agent Nowicki with the phone number of her

8

uncle, and then she called her uncle to put herself at ease. The uncle's phone number was the only U.S. contact information Vixama provided.

Subsequently, on December 22, 2016, the government filed a material witness complaint against Vixama and obtained a warrant for her arrest. On January 12, 2017, Vixama was arrested on the material witness complaint. Because she was now under arrest, Vixama was then transferred into the custody of the U.S. Marshals Service at the Federal Detention Center in Miami ("FDC Miami"). When Vixama was transferred to FDC Miami, ICE personnel within its Enforcement and Removal Operations ("ICE ERO") lodged an immigration detainer against Vixama to ensure that she would be transferred back into ICE detention for immediate deportation once the material witness complaint was dismissed as to the criminal case.

On January 19, 2017, a magistrate judge appointed attorney David Raben to represent Vixama on the material witness complaint. On January 27, 2017, and by agreement of the defendants, the government took a videotaped deposition of Vixama to preserve her testimony for trial.[1] Defendants Smith, Delancy, and their respective defense counsel were present and cross-examined Vixama.

---

[1]The defendants did not require the government to show "exceptional circumstances" under Federal Rule of Criminal Procedure 15(a) to take Vixama's deposition. Rather than having Vixama, an incarcerated material witness, wait in jail until the defendants' trial, the parties agreed she would be deposed and then deported back to Haiti.

9

At that time, the parties expected that after Vixama's deposition was taken two things would happen: (1) the material witness complaint would be dismissed (releasing her from the U.S. Marshals' custody at FDC Miami), and (2) ICE would then deport her back to Haiti and she would be unavailable to testify at trial. If the deposition had not been taken, then Vixama would have remained in the U.S. Marshals' criminal custody until Smith and Delancy's trial. The deposition, however, would allow Vixama to get out of the U.S. Marshals' criminal custody, and then ICE would deport her back to Haiti. Smith and Delancy never objected to the taking of Vixama's videotaped deposition. Smith and Delancy do not dispute that their counsel had a full and adequate opportunity to cross examine Vixama.

Once Vixama's videotaped deposition was completed, a magistrate judge dismissed the material witness complaint against her on February 3, 2017. At the time, Vixama was still in the U.S. Marshals' custody at FDC Miami.

## C.    Vixama's Release from Custody

Once the material witness complaint against Vixama was dismissed as to the criminal case, ICE ERO personnel had 48 hours to pick Vixama up and take her into detention pursuant to the immigration detainer ICE had filed against her. See 18 U.S.C. § 3144; 8 C.F.R. § 287.7(d). ICE ERO personnel did not pick Vixama

10

up within the required 48-hour time period.  As a result, on February 6, 2017, the

U.S. Marshals released Vixama from their custody.[2]

## D.    Government's Multiple Attempts to Locate Vixama

On February 7, 2017, Agent Nowicki learned of Vixama's release and began

his efforts to locate her.  Nowicki contacted Vixama's uncle (whose number

Vixama previously had provided), and he was at work.  Later that night, Nowicki

contacted the uncle again and obtained the uncle's address in Coral Springs,

Florida.  The next day, Nowicki passed on the uncle's contact information to ICE

ERO personnel.

On February 21, 2017, ICE ERO agents went to the uncle's house and

searched the house for Vixama, but were unable to locate her.  The ICE ERO

agents could not get a straight answer from the occupants of the house as to

whether Vixama was staying there.  The occupants of the house told the ICE ERO

agents "they're not sure if [Vixama's] residing there," but the ICE ERO agents

"felt like they were getting the runaround."

---

[2]The same procedure was followed with Francois.  He was held on a material witness complaint, his videotaped deposition was taken with the government, the defendants, and defense counsel present, and then Francois was deported back to Haiti.  The only difference as to Vixama is that she was mistakenly released and then absconded from the trial court's jurisdiction.

11

In March 2017, Agent Nowicki followed up with the ICE ERO agents to see if they had located Vixama but "was told by a supervisor there that they did not have the manpower to go look for her again."

On the morning of April 12, 2017, the government attempted to locate Vixama a third time. The government emailed Vixama's former counsel, David Raben, to see if he knew where Vixama was and to obtain her contact information. Specifically, the Assistant United States Attorney ("AUSA") wrote to attorney Raben:

> I'm writing to see if you have a contact number or know where your former client, Vanessa Armstrong Vixama, is currently residing. It is my understanding that she was released from the custody of the US Marshalls [sic] before ICE ERO officers came to pick her up at FDC. ICE ERO officers have been unable to locate her to date. Since she hasn't been deported yet, we are working to determine if she can be located to testify at trial or if she is unavailable to testify.

Less than an hour later, attorney Raben responded: "I sent an email to family member. I never heard from client after release. Will keep you advised." The following morning, April 13, 2017, attorney Raben sent another email to the AUSA, stating: "She is in Delaware[.] She doesn't have a phone[.] I gave your contact info to her boyfriend[.]"

Later that same day, April 13, 2017, the AUSA sent a trial subpoena for Vixama to attorney Raben via email and again asked for an address or phone number as follows:

12

> Please find attached a trial subpoena for Vanessa Armstrong Vixama. Please let me know if you have an address or phone number to reach her or know of any other means of serving this subpoena to her.
>
> Please provide Ms. Vixama['s] contact information for the case agent, Craig Nowicki . . . .

The subpoena directed Vixama to appear at trial on April 19, 2017, six days later. A few minutes after the AUSA sent the trial subpoena, attorney Raben responded: "I am forwarding info to boyfriend[.]"

On April 15, 2017, the AUSA emailed attorney Raben again, indicating that if Vixama did not appear at trial on April 19, the AUSA would then seek a bench warrant for Vixama. The AUSA's April 15 email asks:

> Have you heard anything back from Ms. Vixama or her boyfriend? If she doesn't appear on Wednesday, April 19th as indicated in the subpoena, we will be seeking a bench warrant.

About an hour later on April 15, attorney Raben sent the AUSA an email with the name and phone number of Vixama's boyfriend, stating: "You can call her now at this number."[3] In a separate email, attorney Raben stated: "I just emailed you her number. I believe she will cooperate." (emphasis added) From this exchange, it appeared that attorney Raben had successfully gotten the trial subpoena to Vixama through her boyfriend and that Vixama would cooperate.

---

[3]The boyfriend's name, Florestal Fuegens, is in the record, but his phone number is not. Thus, we do not know the area code of the phone number.

13

Later that same day, Agent Nowicki attempted to call Vixama's boyfriend, but the call "went to an unset-up voicemail box" and Nowicki was not able to leave a message. Agent Nowicki then sent a text message to the boyfriend identifying himself as a Homeland Security agent, advising the boyfriend that Vixama was needed in Miami, and requesting that Vixama call him back. Agent Nowicki did not receive a response to this text message.

On April 17, 2017, the first day of trial, the government informed the district court that it intended to present Vixama's deposition testimony. The government explained that, after her deposition was taken, Vixama was released from the U.S. Marshals' custody and was not picked up by ICE ERO personnel to be returned to immigration detention. The government described the various steps it had taken to locate Vixama. The government stated that it still considered her to be "unavailable" because it had not been able to locate her. In response, defendant Smith moved that Vixama be required to testify, arguing that she was "available" because she was still somewhere within the borders of the United States and was not yet deported. The district court directed the parties to file memoranda and caselaw on the admissibility of Vixama's deposition testimony.

E.    **Parties' Motions Regarding Admission of Vixama's Deposition**

On April 18, 2017, the government filed a motion in limine to use Vixama's videotaped deposition at trial. The government argued that it had made good-faith

14

efforts to locate Vixama and compel her attendance at trial but had been unable to do so. The government therefore asserted that Vixama should be deemed "unavailable" for trial, and her videotaped deposition should be admitted pursuant to Federal Rule of Evidence 804 and 8 U.S.C. § 1324. In the meantime, Agent Nowicki attempted to call and text Vixama's boyfriend again on April 18 but again received no response.

That same day, defendant Smith filed a motion to exclude Vixama's deposition, which defendant Delancy adopted. Smith argued that the government had not demonstrated Vixama was "unavailable" under the Federal Rules of Evidence, because it knew she was in Delaware, and had not made a reasonable, good-faith effort to ascertain her precise whereabouts.

The next day, April 19, 2017, the government asked the district court to issue a bench warrant for Vixama's arrest in light of her failure to comply with the trial subpoena. The district court issued a bench warrant but did not rule on the motions regarding the admissibility of Vixama's deposition. The bench warrant was entered into the National Criminal Information Center ("NCIC") database.

The government also sent a copy of the bench warrant to Vixama's former counsel, Raben. And Raben again attempted to contact Vixama's boyfriend but received no response. In an email on April 20 at 6:05 a.m., Raben informed the

15

prosecutor that "I spoke to boyfriend this morning and explained consequences of her failing to contact agent."

## F.    Hearing on Admissibility of Vixama's Deposition

On April 20, 2017 (the fourth day of trial), after the day's testimony concluded, the district court dismissed the jury and held a hearing on the admissibility of Vixama's deposition testimony.  At the hearing, Agent Nowicki testified regarding the above-described events and the government's multiple attempts to locate and contact Vixama.  The government emphasized (1) that Vixama was a deportable alien, (2) that if she now contacted law enforcement (such as Agent Nowicki), she could be deported, and (3) that she had every motivation to hide from the AUSA and law enforcement and to not make herself available at trial.  The government argued that it made reasonable, good-faith efforts to obtain Vixama's presence at trial.  Defendants Smith and Delancy asserted that the government's efforts to locate Vixama were insufficient to establish good faith.

The district court found that Vixama was "unavailable" and that the government had made good-faith, reasonable efforts to secure her presence at trial. The district court rejected the defendants' contention that the government's efforts were "merely perfunctory" and found, based on Agent Nowicki's credible testimony, that the government's efforts to locate Vixama were reasonable under

16

the totality of the circumstances.  On April 21, 2017, Vixama's videotaped deposition was played for the jury over the defendants' objection.

## G.     Convictions and Sentences

The jury found both defendants guilty as charged on all counts.  At sentencing, Smith had a total offense level of 25 and a criminal history category of III, resulting in an advisory guidelines range of 70 to 87 months' imprisonment.  Delancy had a total offense level of 23 and a criminal history category of V, resulting in an advisory guidelines range of 84 to 105 months' imprisonment.

The district court sentenced Smith to 87-month prison sentences on Counts 1 (conspiracy) and 24 (illegal reentry) and 60-month sentences on Counts 2 through 22 (alien smuggling), all to run concurrently with each other but consecutive to Smith's revocation sentence in a separate federal case related to his prior alien smuggling conviction.  The district court sentenced Delancy to 90-month sentences on Counts 1 (conspiracy) and 23 (illegal reentry) and 60-month sentences on Counts 2 through 22 (alien smuggling), all to run concurrently with each other but consecutive to Delancy's revocation sentence in a separate federal case related to his prior illegal reentry conviction.[4]

## III. VIXAMA'S VIDEOTAPED DEPOSITION

---

[4]On appeal, neither defendant raises any challenge to their guidelines calculations or to the reasonableness of their sentences.

17

## A.    Standard of Review

Typically, we review challenges to the district court's rulings on the admissibility of evidence for an abuse of discretion.  United States v. Gari, 572 F.3d 1352, 1361 (11th Cir. 2009).  But we review de novo a defendant's claim that his Sixth Amendment rights were violated.  See id.; see also United States v. Ignasiak, 667 F.3d 1217, 1227 (11th Cir. 2012) ("A defendant's claim that his Sixth Amendment rights were violated is reviewed de novo."); United States v. Yates, 438 F.3d 1307, 1311 (11th Cir. 2006) (en banc) ("[W]e review de novo Defendants' claim that their Sixth Amendment rights were violated."); United States v. Siddiqui, 235 F.3d 1318, 1322 (11th Cir. 2000) ("We . . . give plenary review to claims of constitutional error for a failure to show the unavailability of an out-of-court declarant.").  Such claims, however, are subject to harmless error review.  United States v. Lang, 904 F.2d 618, 625-26 (11th Cir. 1990).

Here, defendants Smith and Delancy challenge the admissibility of Vixama's videotaped deposition only on the ground that it violated their Confrontation Clause rights under the Sixth Amendment.  Accordingly, we review their claim de novo.

## B.    Applicable Federal Rules

Before addressing the Confrontation Clause issue, we review the relevant federal rules as background.

18

Federal law provides for the admission at trial of a material witness's videotaped deposition testimony in alien smuggling cases if the witness has been deported. See 8 U.S.C. § 1324(d). The defendants agreed to Vixama's deposition and expected that Vixama would be deported immediately to Haiti after that deposition, meaning that her videotaped deposition would then be admissible at trial under § 1324(d). Id. ("[T]he videotaped (or otherwise audiovisually preserved) deposition of a witness to a violation of subsection (a) who has been deported or otherwise expelled from the United States, or is otherwise unable to testify, may be admitted into evidence in an action brought for that violation.").

Contrary to the expectations of both the defendants and the government, Vixama was not transferred by the U.S. Marshals Service to ICE, per the latter's detainer, because ICE missed the 48-hour deadline to take Vixama into custody upon dismissal of the material witness complaint. That being so, upon her release, Vixama was able to escape deportation.[5]

Because Vixama had not been deported at the time of trial, we look to Federal Rule of Criminal Procedure 15(f), which provides that a witness's deposition testimony may be used at trial if the witness is "unavailable," as

---

[5]Section 1324(d) provides for the videotaped deposition of an illegal alien and the admission of that deposition at trial so that the alien witness may be promptly deported and not have to suffer prolonged detention until a defendant's criminal trial. 8 U.S.C. § 1324(d). For the deposition to be admissible, the illegal alien has to be deported by the time of trial. No one disputes that Vixama was to be deported as soon as she gave her deposition.

19

determined by Federal Rule of Evidence 804.  See Fed. R. Crim. P. 15(f) ("A party may use all or part of a deposition as provided by the Federal Rules of Evidence.").

In turn, Federal Rule of Evidence 804(a)(5)(A) provides that a witness is considered to be "unavailable" if, among other things, the witness is absent from the trial and the government "has not been able, by process or other reasonable means, to procure . . . the declarant's attendance."  Fed. R. Evid. 804(a)(5)(A).  If a witness is "unavailable," the Federal Rules of Evidence do not exclude as hearsay the witness's former testimony given in a lawful deposition at which the defendant had an opportunity for cross-examination.  Fed. R. Evid. 804(b)(1).

As explained below, unavailability must ordinarily also be established to satisfy the requirements of the Confrontation Clause, which we discuss next.

## C.    Confrontation Clause

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  Most of the time, this means that a witness must appear in person and give live testimony at trial if her statements are to be used against the defendant.  See Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 1365 (2004).

The defendant's right to a witness's live testimony in the courtroom serves many important purposes, including allowing the jury to observe closely the

20

witness's demeanor, expressions, and intonations, and thereby determine the witness's credibility. See Ohio v. Roberts, 448 U.S. 56, 63-64, 100 S. Ct. 2531, 2537-38 (1980), abrogated in part on other grounds by Crawford, 541 U.S. at 60-69, 124 S. Ct. at 1369-74. The Supreme Court has emphasized that in-court confrontation not only allows the defendant to test the witness's recollection, but also compels the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Id. (internal quotations omitted); see also Barber v. Page, 390 U.S. 719, 721, 88 S. Ct. 1318, 1320 (1968) (stating same).

Of course, the Supreme Court has also told us that the right to a witness's presence at trial is not absolute. In Crawford, the Supreme Court expressly held that the testimony of a witness who does not appear at trial is still admissible, in the constitutional sense, if these two conditions are met: (1) the witness "was unavailable to testify"; and (2) "the defendant had had a prior opportunity for cross-examination." Crawford, 541 U.S. at 59, 124 S. Ct. at 1369. Accordingly, prior cross-examination alone cannot substitute for the defendant's right to live testimony in the courtroom unless the witness meets the Confrontation Clause's requirement of "unavailability." See id.; see also Roberts, 448 U.S. at 65, 100 S. Ct. at 2538 (noting that the "Framers' preference for face-to-face accusation"

21

requires the proponent of recorded testimony to demonstrate unavailability of the witness, "including [in] cases where prior cross-examination has occurred."). The integrity of the fact-finding process is at stake because the Confrontation Clause is a procedural protection. Crawford, 541 U.S. at 61, 124 S. Ct. at 1370.

The parties do not dispute that the government was authorized to take Vixama's videotaped deposition, that both the defendants and their counsel were physically present during the videotaped deposition, or that the defendants' counsel had an adequate and full opportunity to cross-examine Vixama at her deposition. Her testimony was taken precisely for use at trial, given she would be deported before trial. In fact, the government's direct and redirect examination of Vixama totals approximately 32 pages, whereas the cross-examination by defense counsel, together, totals 79 pages of the deposition transcript. Defense counsel tested Vixama's testimony and credibility with sufficient cross-examination.

Therefore, the sole issue on appeal is whether Vixama was "unavailable" to testify at the time of trial.

### D.   "Unavailable" Witnesses

A witness is "unavailable" for purposes of the Confrontation Clause if the witness does not appear and the government has "made a good-faith effort" to obtain the witness's presence at trial. Hardy v. Cross, 565 U.S. 65, 69, 132 S. Ct. 490, 493 (2011); see also Roberts, 448 U.S. at 74, 100 S. Ct. at 2543 (examining

22

whether the prosecution "made a good-faith effort" to obtain the witness's presence at trial (internal quotation marks omitted)); Siddiqui, 235 F.3d at 1324. Because Vixama did not appear at trial, our inquiry here narrows to whether the government made "a good-faith effort" to obtain her presence.

We do not write on a blank slate as to what constitutes "a good-faith effort." The Supreme Court has told us that whether "a good-faith effort" has been made is "a question of reasonableness." Roberts, 448 U.S. at 74-75, 100 S. Ct. at 2543 (emphasis added) (internal quotation marks omitted). Specifically, "[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." Id. at 74, 100 S. Ct. at 2543 (internal quotation marks omitted); see Hardy, 565 at 70, 132 S. Ct. at 494 (quoting same).

The Supreme Court has also held that the prosecution bears the burden to show it made a good-faith effort to produce the witness. Roberts, 448 U.S. at 74-75, 100 S. Ct. at 2543. And the "'possibility of a refusal is not the equivalent of asking and receiving a rebuff.'" Id. at 76, 100 S. Ct. at 2544 (quoting Barber v. Page, 390 U.S. 719, 724, 88 S. Ct. 1318, 1322 (1968)). A good-faith effort, however, does not require futile acts. Id. at 74, 100 S. Ct. at 2543.

Furthermore, the Supreme Court in Hardy emphasized that, "[w]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth

23

Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Hardy, 565 U.S. at 71-72, 132 S. Ct. at 495. The Supreme Court in Hardy also pointed out that in Roberts, "[w]e acknowledged that there were some additional steps that the prosecutor might have taken in an effort to find the witness, but we observed that '[o]ne, in hindsight, may always think of other things'" that could have been done. Id. at 70, 132 S. Ct. at 494 (quoting Roberts, 448 U.S. at 75, 100 S. Ct. at 2544).

Although our Circuit has little precedent in this area, we have applied Roberts's reasonableness standard before. Siddiqui, 235 F.3d at 1324 (11th Cir. 2000) (citing Roberts, 448 U.S. at 74, 100 S. Ct at 2543 and acknowledging that "[t]he lengths to which the government must go to produce a witness is a matter of reasonableness"). Siddiqui involved two foreign witnesses who resided in Japan and Switzerland and were outside of the United States at the time of the trial. See id. at 1320-21. After the depositions of both witnesses, the government sent them letters urging them to come and testify in person, but the witnesses declined to do so. Id. at 1324-25. Our Court recounted other facts in the case, such as that during their depositions, the witnesses already indicated an unwillingness to travel to attend the trial. Id. at 1324. Given all the factual circumstances, this Court concluded that the government had shown that the foreign witnesses were

24

unavailable despite the government's good-faith efforts to obtain their presence at trial.  Id.

Of course, Siddiqui involved foreign witnesses outside the United States at the time of trial.  Here, we must address the different factual situation[6] of a foreign witness, like Vixama, who resides in Haiti and is a Haitian citizen, but is temporarily within the United States at the time of trial.  Yet that is far from the whole story.  In this case, the missing foreign witness Vixama (1) has no cell phone or address in the United States, (2) is illegally here, and (3) has absconded from the jurisdiction of the trial court in Florida to avoid detention and immediate deportation to Haiti.  Although the government successfully sent a trial subpoena to the witness Vixama, through her former attorney and her boyfriend, and her former attorney reported back to the government that she would cooperate, Vixama still refused to appear at trial.

We are unaware of a similar factual case, but we do know from the Supreme Court that there is no brightline rule for reasonableness, and that a reasonableness inquiry necessarily is fact-specific and examines the totality of the factual circumstances of each particular case.  See, e.g., Roberts, 448 U.S. at 75-77, 100 S. Ct. at 2543-45 (basing its reasonableness determination on all the "facts

---

[6]Because the foreign nationals in Siddiqui were outside the United States, the United States could only request them to appear with perhaps a promise to pay their travel.  Thus, Siddiqui is not instructive here where the witness was physically present in the United States.

presented"); United States v. Banks, 540 U.S. 31, 36, 124 S. Ct. 521, 525 (2003)

(treating "reasonableness as a function of the facts of cases so various that no

template is likely to produce sounder results than examining the totality of

circumstances in a given case"); Ohio v. Robinette, 519 U.S. 33, 39, 117 S. Ct.

417, 421 (1996) (eschewing "bright-line rules," emphasizing "the fact-specific

nature of the reasonableness inquiry," and instructing courts to examine "the

totality of the circumstances"); Ker v. California, 374 U.S. 23, 33, 83 S. Ct. 1623,

1629-30 (1963) (emphasizing "there is no formula for the determination of

reasonableness" and "[e]ach case is to be decided on its own facts and

circumstances" (internal quotation marks and alterations omitted)).[7]

Therefore, our task is to examine the government's cumulative efforts here

to determine if the district court correctly decided that the government made a

good-faith, reasonable effort to obtain Vixama's presence at trial.

---

[7]While Roberts is a Confrontation Clause case, the Supreme Court has adopted a reasonableness standard for evaluating the government's conduct as to other constitutional rights of a defendant. In doing so, the Supreme Court consistently has emphasized that a reasonableness inquiry is highly fact-specific. See, e.g., United States v. Arvizu, 534 U.S. 266, 273-74, 122 S. Ct. 744, 750-51 (2002) (explaining the Supreme Court has "deliberately avoided reducing [reasonableness] to a neat set of legal rules" (internal quotation marks omitted)); Missouri v. McNeely, 569 U.S. 141, 150, 133 S. Ct. 1552, 1559 (2013) (explaining "the fact-specific nature of the reasonableness inquiry . . . demands that we evaluate each case of alleged exigency based on its own facts and circumstances." (citation and internal quotation marks omitted)); Stephens v. DeGiovanni, 852 F.3d 1298, 1315 (11th Cir. 2017) (stressing the reasonableness standard "requires careful attention to the facts and circumstances of each particular case" (internal quotation marks)); Rodriguez v. Farrell, 280 F.3d 1341, 1346-47 (11th Cir. 2002) (emphasizing "we must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness").

26

**E.    Discussion**

Given the specific facts of this case recounted at length above, we are convinced that the district court did not err in admitting Vixama's videotaped deposition testimony.

We start with how Agent Nowicki attempted to locate Vixama multiple times. Immediately after learning of Vixama's release on February 6, 2017, Agent Nowicki on February 7 contacted her uncle, whose name and phone number Vixama had previously provided. During Agent Nowicki's two efforts to contact the uncle, he was successful in obtaining the uncle's address. After doing that, Agent Nowicki requested that ICE ERO agents visit the uncle's house to look for Vixama.

The ICE ERO agents then did that on February 21, 2017. They even searched the house, but were unable to locate Vixama and found her relatives to be uncooperative. And after the ICE ERO agents failed to locate Vixama at the uncle's house, Agent Nowicki followed up with them again about Vixama in March 2017. Ultimately, Agent Nowicki was told ICE ERO did not have the manpower to look for her again at that time.

Importantly, at this juncture, Vixama had given her deposition, the material witness complaint had been dismissed, and Agent Nowicki had no basis to take her into custody. Significantly, though, there was still an immigration detainer against

27

Vixama. It was plainly reasonable for Agent Nowicki to turn initially to ICE for help in locating Vixama.

Even so, the government's efforts to locate Vixama did not stop. In the week leading up to the April trial, the government continued its efforts to locate Vixama by reaching out to her former counsel Raben four times, issuing a trial subpoena, and thrice attempting to communicate with Vixama using her boyfriend's cell phone number. It was patently reasonable for the government to contact Raben, as Vixama's former counsel, to try to locate her. Raben had represented Vixama regarding the material witness complaint against her in this very case. As such, Raben had an established relationship with Vixama and access to her in a way that the government did not. And Vixama had no address or cell phone.

Moreover, the government's efforts through attorney Raben did not fall on deaf ears. As evidenced by the email communications recounted above, former counsel Raben advised the government that although Vixama did not have a phone number, he was forwarding the government's communications, and later the trial subpoena, to Vixama through her boyfriend. The government thus made good progress as the government had gotten Vixama's former counsel to send her the subpoena. Subsequently, on April 15, Raben even advised that he believed Vixama "will cooperate." Given how little information the government had and

28

how promptly and helpfully Raben contacted her boyfriend and responded, it was also reasonable for the government to rely on these efforts through Vixama's former lawyer.

Further, given that Raben had represented Vixama as to the material witness complaint, it was also reasonable to rely on her former attorney's assessment and representation that she "will cooperate." When Vixama did not appear the third day of trial on April 19, the government obtained a bench warrant and also sent it to her former attorney, once again in an effort to secure her presence at trial. Her attorney then tried to contact the boyfriend again (who had been responsive to Raben about the trial subpoena). But this time, the boyfriend did not respond to even attorney Raben.

We also cannot ignore Vixama's obvious determination to go into hiding and to elude capture. She had three times before failed to obtain a visa to the United States, which led to her attempt to sneak to the United States via the defendants' illegal smuggling scheme. Then, when she was mistakenly released, she immediately capitalized on that mistake by absconding and fleeing from the jurisdiction of the trial court in Florida. While her boyfriend was reportedly in Delaware and initially cooperative with Vixama's former lawyer, he then stopped responding to calls or texts to his cell phone. Given these undisputed circumstances, it was reasonable for the government to try to locate Vixama

29

through her former lawyer, which is confirmed by the facts that the lawyer quickly and helpfully responded to the government and then successfully sent the trial subpoena to Vixama through her boyfriend. And once Vixama failed to appear at trial, it was also reasonable for the government to send the bench warrant to her former lawyer in an effort to obtain her presence.

Simply put, the Confrontation Clause does not require the government to make every conceivable effort to locate a witness; it requires only a good-faith effort that is reasonable under all of the circumstances of the case. See Hardy, 565 U.S. at 69-70, 132 S. Ct. at 493-94; Roberts, 448 U.S. at 74-76, 100 S. Ct. at 2543-44. As the Supreme Court has told us, "[o]ne, in hindsight, may always think of other things." Roberts, 448 U.S. at 75, 100 S. Ct. at 2544. "[G]reat improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." Id. at 75-76, 100 S. Ct. at 2544; see also Hardy, 565 U.S. at 70-72, 132 S. Ct. at 494-95.[8] That epitomizes this case.

---

[8] In Roberts, the witness's mother testified that her daughter was traveling outside of Ohio, that she had not heard from her in over a year, and that she and her family knew of no way to reach the witness even in an emergency. Roberts, 448 U.S. at 75, 100 S. Ct. at 2543-44. The prosecutor knew a social worker in San Francisco had called the mother about her daughter, but the prosecutor did not attempt to locate the social worker or daughter in San Francisco. Id. at 75, 100 S. Ct. at 2544. Nonetheless, the Supreme Court concluded the prosecutor's efforts were reasonable.

30

At bottom, a reasonable, good-faith effort is case-specific and contextually driven.  Vixama had no phone or address, had absconded outside the State of Florida, was in hiding, and had a strong incentive not to be found.  The government had extremely limited information regarding her whereabouts, but yet the government succeeded in having the trial subpoena sent to her through her former attorney and boyfriend.  While the government's multiple efforts and pursuit of different ways to locate Vixama—first at her uncle's house, then through her former attorney, and finally through her boyfriend—were unavailing, they constituted a good-faith effort that was reasonable under the factual circumstances of this case.

Accordingly, we affirm the district court's admission of Vixama's videotaped deposition at trial.  See Roberts, 448 U.S. at 75-77, 100 S. Ct. at 2543-45 (affirming the admissibility of prior recorded testimony of a witness outside the state where the prosecutor sent subpoenas to the home address of the witness's parents although the prosecutor knew the witness was not there and the parents had no way to reach her); United States v. Thomas, 705 F.2d 709, 711-12 (4th Cir. 1983) (affirming the admissibility of prior recorded testimony where the two witnesses vanished and the government attempted in vain to locate them).

## IV. PROSECUTORIAL MISCONDUCT

31

Smith also argues that the prosecutor made inappropriate comments during closing argument. We review this prosecutorial misconduct claim de novo. See United States v. Sosa, 777 F.3d 1279, 1294 (11th Cir. 2015).

## A.    Prosecutor's Statements During Closing Argument

Prior to trial, the government noticed its intent to introduce, under Federal Rule of Evidence 404(b), Smith's prior 2013 conviction for alien smuggling. The notice explained that Smith pled guilty in June 2013 to a single count of alien smuggling for profit, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), and argued this prior conviction was relevant to establish, among other things, Smith's knowledge, intent, and lack of mistake in the present case. Smith responded that the district court should not allow the government to introduce his prior conviction, but the district court ultimately allowed the government to admit the first page of the judgment from Smith's prior conviction at trial.[9] The judgment indicated that Smith's prior case was prosecuted in the West Palm Beach division of the Southern District of Florida.

During closing arguments, Smith's counsel argued that a true alien smuggler likely would take the most direct route from the Bahamas to the United States to

---

[9]Smith does not challenge the admission of his prior conviction on appeal. The government also admitted the first page of Delancy's judgment of conviction for his prior illegal reentry case, which also was prosecuted in the West Palm Beach Division. Delancy likewise does not challenge the admission of his prior conviction on appeal.

32

avoid detection by law enforcement on the open seas. That route, counsel asserted, would be the one directly west from Freeport, Bahamas to Boynton Beach, Florida. Counsel noted that was not the route Smith took and contended that Smith's explanation that he was going to Bimini made the most sense given where his boat ultimately ended up.

In rebuttal, the government pointed to the fact that Smith's prior conviction occurred in West Palm Beach (which is near Boynton Beach) to explain why the defendants chose not to take the most direct route from the Bahamas to Florida. Smith's counsel objected and reserved a motion for mistrial. The district court overruled Smith's objection, and the government continued its argument, stating:

> It's not an accident that they're down south of Bimini as opposed to going straight across. When you bring 21 aliens into the United States, you don't come into a marina, a port, a harbor. You're smuggling these aliens into the country illegally. So . . . to go down south away from where you're last caught, it's not an accident or mistake. You're trying to get in undetected.

After the government concluded its rebuttal, Smith moved for a mistrial based on the government's comments. Smith contended that it was inappropriate for the government to argue that his prior conviction occurred in West Palm Beach simply because the judgment came from the West Palm Beach division. Smith explained that the Southern District of Florida extends from Key West to Fort Pierce, and activity that occurs in one division within the district may be indicted

33

in a different division. Smith asserted that it was "extremely misleading" to say his prior offense was committed in West Palm Beach.

The government responded that the case number for Smith's prior conviction also indicated the case originated in West Palm Beach. The government further asserted that Smith opened the door with his argument that smugglers would take the most direct route between the Bahamas and Florida.

The district court denied Smith's motion for a mistrial, finding the government's statement that the prior conviction occurred in West Palm Beach was accurate and not misleading. The district court further determined that Smith opened the door by emphasizing that it made no sense for Smith not to take the shortest route, and the government's argument in response to that point was fair.

## B.    Discussion

To show prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) the remarks prejudicially affected his substantial rights. United States v. Sosa, 777 F.3d 1279, 1294 (11th Cir. 2015). A defendant's substantial rights are prejudicially affected when there is a reasonable probability that, absent the remarks, the outcome of the trial would have been different. Id.

The prosecutor's comments during closing argument must be viewed in the context of the trial as a whole. United States v. Reeves, 742 F.3d 487, 505 (11th

34

Cir. 2014).  Though the prosecutor may not exceed the evidence presented at trial in closing arguments, he may state conclusions drawn from the evidence.  Id.  The prosecutor is also entitled to make a fair response to defense counsel's arguments, and issues raised by the defendant in his closing argument are fair game for the prosecution on rebuttal.  Id.

Here, the district court did not err in denying Smith's motion for a mistrial based on the prosecutor's comments about Smith's prior conviction during closing arguments.  The prosecutor's statement that Smith's prior alien smuggling conviction occurred in West Palm Beach was accurate—the judgment of that conviction, which was admitted into evidence at trial, indicates that it was entered in the West Palm Beach division of the Southern District of Florida.  And as the district court noted, the prosecutor's remarks were made in direct response to Smith's argument during his closing that it would make no sense for an alien smuggler not to take the most direct route from the Bahamas to Florida.  Given that argument by Smith, it was not unfair for the prosecutor to point out, as a potential motive for taking a different route, that Smith's prior conviction occurred in the same area where the most direct route would lead.  See id. at 505.

Even assuming arguendo that Smith showed the prosecutor's comments were improper, his claim still fails because the comments did not affect his substantial rights.  Sosa, 777 F.3d at 1294.  Ample evidence at trial supported the

35

jury's verdict that Smith was engaged in alien smuggling.  Francois and Vixama

both testified that the boat left Freeport late at night, under cover of darkness; that

they believed they were traveling to the United States; and that the defendants

instructed them not to draw attention to their boat while they were lost at sea.

Vixama also testified that her family paid $5,000 for her passage to Miami.  The

Coast Guard witnesses testified that Smith's story—that he was traveling to

Bimini—was suspicious, given the location in which the boat was found and the

direction of the currents in that area.  And both the CBP pilot and Agent Nowicki

testified that alien smugglers do not always take a direct route and often take

evasive actions to disguise their activities.  There is not a reasonable probability

that, but for the prosecutor's comment on rebuttal, the jury would have found

Smith not guilty.  Id. at 1294.[10]

## V. CUMULATIVE ERROR

Under the cumulative error doctrine, an aggregation of otherwise

nonreversible errors can warrant reversal where the combined effect of the errors

denied the defendant his constitutional right to a fair trial.  See United States v.

Mosquera, 886 F.3d 1032, 1052 (11th Cir. 2018).  But "where there is no error or

---

[10]Delancy's brief purports to adopt Smith's arguments as to this claim "as pertinent to him."  Notably, however, Delancy did not object to the prosecutor's closing argument or join Smith's motion for a mistrial.  In any event, Delancy's adopted claim fails for the same reasons Smith's does.

only a single error, there can be no cumulative error." United States v. King, 751

F.3d 1268, 1277-78 (11th Cir. 2014) (internal quotations omitted).

Here, as explained above, the district court committed no error. Smith's

claim of cumulative error therefore lacks merit.[11] Id.

## VI. RESPONSE TO DISSENT ABOUT VIXAMA'S DEPOSITION

Our colleague concurs in our majority opinion except as to the admission of

Vixama's videotaped deposition. The dissent does not dispute that (1) the

defendant's counsel, with the defendants present, had a full opportunity to cross-

examine Vixama during her videotaped deposition, (2) that Vixama's deposition is

admissible if she was unavailable, and (3) that a witness is unavailable if she does

not appear at trial and if the government demonstrates it made a good-faith,

reasonable effort to obtain her presence. The dissent parts company, however,

with the majority opinion's affirmance of the district court's admission of

Vixama's videotaped deposition based on its determination that the government

made a good-faith, reasonable effort to obtain Vixama's presence at trial but she

failed to appear.

We respond to the dissent's 43-page criticism of this portion of our majority

opinion, in three parts below: (1) why the dissent's claim—that the majority

---

[11]To the extent Delancy purports to raise a claim of cumulative error, his claim likewise fails.

opinion "does not heed the lessons of <u>Hardy</u> and <u>Roberts</u>"—is just flat wrong;

(2) why the dissent's analysis of what constitutes a good-faith, reasonable effort is

flawed in multiple ways; and (3) why the four decisions of other circuits, discussed

by the dissent, demonstrate the fact-specific nature of the reasonableness inquiry

and why the majority opinion properly applies the reasonableness standard to the

facts of this case.

## A.    Lessons of <u>Roberts</u> and <u>Hardy</u>

We start with the dissent's accusations that our majority opinion "does not

heed the lessons of <u>Hardy</u> and <u>Roberts</u>," and "completely misses th[e] lesson from

<u>Hardy</u> and <u>Roberts</u>."  Dissenting Op. at 94, 96.  Because the dissent cherry picks a

phrase or two from those decisions out of context, those two Supreme Court

decisions warrant a full discussion.  These decisions actually support the majority

opinion.  In fact, in both <u>Roberts</u> and <u>Hardy</u>, the Supreme Court <u>upheld the trial

court's admission of prior recorded testimony</u> of a witness who did not appear at a

criminal trial, just as we do here in upholding the district court's admission of the

prior recorded testimony of Vixama, who likewise did not appear at trial.

More specifically, in <u>Ohio v. Roberts</u>, the Supreme Court upheld the trial

court's decision to admit the preliminary hearing testimony of a key witness,

Anita, who did not appear at trial.  <u>See</u> 448 U.S. at 60, 77, 100 S. Ct. at 2536, 2545.

Between November 1975 and March 1976, the criminal case was set and reset for

38

trial four times with repeated continuances leading to new trial dates.  Id. at 59, 100 S. Ct. at 2535.  Each time, the government sent trial subpoenas to the witness, Anita, at her parents' Ohio address, resulting in five subpoenas sent there.  Id. Although the government knew the witness (Anita) had not been at that residence for a long time, her parents' home was her "last-known real address."  Id. at 59, 76, 100 S. Ct. at 2535, 2544.

After the preliminary hearing on January 10, 1975, Anita had left for Arizona, and, a year before trial, a San Francisco social worker communicated with the parents about Anita's welfare application.  Id. at 59-60, 100 S. Ct. at 2535-36. After that time, though, the witness had called her parents only once and had not been in touch with her siblings.  Id.  During that last phone call, which occurred about seven or eight months before trial, the witness Anita told her parents that she "was traveling" outside Ohio, but she did not advise them of where she was.  Id. The witness's mother attested that she knew of no way to reach the witness, even in case of emergency, and that she did not "know of anybody who knows where she is."  Id.  (citation and internal quotation marks omitted).

In holding the preliminary hearing testimony was admissible, the Supreme Court stressed that "[g]iven these facts, the prosecution did not breach its duty of good-faith effort."  Id. at 75, 100 S. Ct. at 2544.  The Supreme Court emphasized that, "[t]o be sure, the prosecutor might have tried to locate by telephone the San

39

Francisco social worker with whom [Anita's mother] had spoken many months before and might have undertaken other steps in an effort to find Anita." Id.  The Supreme Court reasoned that "[one], in hindsight, may always think of other things" to do. Id.  But the Supreme Court noted that the prosecutor had sent multiple subpoenas to Anita's "last-known real address" and "had no clear indication, if any at all, of Anita's whereabouts." Id. at 76, 100 S. Ct. at 2544.  Her last known address, of course, was her parents address in Ohio, where the witness had not been since the preliminary hearing in January 1975, some 14 months before the trial. See id. at 59-60, 76, 100 S. Ct. at 2535-36, 2544.

For sure, Roberts is not on all fours with this case.  Nonetheless, it teaches that the prosecutor is not required to pursue every lead or step in order to be deemed to have acted reasonably.  Importantly, Roberts illustrates that reasonableness depends on the particular facts of each case and makes clear that it is not our job to second guess, in hindsight, the prosecutor's efforts.  Plus, Roberts upheld the admission of the prior preliminary hearing testimony where the government's efforts were arguably far less than those here.  All the prosecutor did in Roberts was send a subpoena to Anita's parent's address each of the multiple times the case was reset. See id. at 59, 75, 100 S. Ct. at 2535, 2544.

The dissent also relies heavily on Hardy v. Cross, but there again the Supreme Court upheld the state trial court's admission of a victim's prior

40

testimony when she did not appear at trial. 565 U.S. at 70-72, 132 S. Ct. at 494-95.[12] In Hardy, the defendant was charged with the kidnapping and sexual assault of victim A.S. Id. at 66, 132 S. Ct. at 491. A.S. testified and was cross-examined at Cross's first trial, which ended in his acquittal on the kidnapping charge and a mistrial on the sexual assault charges. Id.

Victim A.S. initially indicated that she was willing to testify again at the retrial, and the prosecutor "remained in constant contact with A.S. and her mother" leading up to the retrial. Id. at 66, 132 S. Ct. at 492 (internal quotation marks omitted). However, before the retrial, A.S.'s mother and brother informed the state's investigator that they did not know where A.S. was, and A.S.'s mother stated that A.S. was afraid to testify again. Id. The investigator later spoke to A.S.'s father, who did not know where A.S. was. Id. at 66-67, 132. S. Ct. at 492. Thereafter, the state undertook various efforts to locate A.S., including keeping in contact with her family members, visiting A.S.'s last known address (her mother's house), and conducting checks with various government agencies. Id. at 67-68, 132 S. Ct. at 492-93. On a final visit to the mother's house on the day before the retrial, A.S.'s mother told police that A.S. had called two weeks earlier and said

---

[12]Similar to this case, Roberts was a direct appeal with de novo review. In contrast, Hardy involved a 28 U.S.C. § 2254 petition challenging a state conviction, where the Supreme Court applied a deferential review under the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254. Yet because the dissent alleges that the majority opinion purportedly failed to heed Hardy's lessons, we likewise explain why the dissent's observation is wrong.

41

she did not want to testify and would not return to Chicago for the retrial.  Id. at 68,
132 S. Ct. at 493.  A.S.'s mother also told police she did not know where A.S. was
or how to reach her.  Id.

The state trial court admitted A.S.'s prior testimony at Cross's retrial.  Id. at
68-69, 132 S. Ct. at 493.  Cross was convicted of sexual assault.  Id.  Affirming,
the Illinois Court of Appeals agreed with the trial court that A.S. was unavailable
and that the state made a good-faith effort to locate her.  Id. at 69, 132 S. Ct. at
493.  The Illinois Court of Appeals agreed A.S. was unavailable because "[i]t is
clear from her telephone conversation with her mother that she was not in the city"
and "also evident that she was in hiding and did not want to be located."  Id. at 69,
132 S. Ct. at 493 (internal quotation marks omitted).

Cross then filed a federal habeas corpus petition, arguing in part that the
admission of A.S.'s prior testimony violated his Confrontation Clause rights.  Id.
After the district court denied Cross's petition, the Seventh Circuit reversed.  Id.
The Seventh Circuit faulted the prosecutor for failing to contact A.S.'s current
boyfriend or her other friends in the Chicago area, for not contacting the
cosmetology school where A.S. was once enrolled, and for neglecting to even
serve A.S. with a subpoena after she expressed fear about testifying at the retrial.
Id. at 70-71, 132 S. Ct. at 494-95.

In reversing the Seventh Circuit in Hardy, the Supreme Court concluded that the Illinois Court of Appeals' holding—that the state had made a good-faith effort to locate A.S. and that the trial court did not err in admitting her testimony—was not an unreasonable application of Confrontation Clause precedent. Id. at 70-72, 132 S. Ct. at 494-95. The Supreme Court remarked that "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence," but emphasized that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Id. at 71-72, 132 S. Ct. at 495 (citation omitted). The Supreme Court noted that the record did not show that A.S.'s family members or other person interviewed "provided any reason to believe" that they had information about A.S.'s whereabouts and there was "no reason to believe" that the cosmetology school had better information about A.S.'s location that did her family members. Id. at 71, 132 S. Ct. at 494. As to the lack of a subpoena, the Supreme Court stressed also that "[w]e have never held that the prosecution must have issued a subpoena if it wishes to prove that a witness who goes into hiding is unavailable for Confrontation Clause purposes." Id. at 71, 132 S. Ct. at 494 (emphasis added).

The dissent lifts this phrase—"reason to believe"—from Hardy out of context and remolds that dicta into her proposed legal or per se rule: that the

43

government does not make a good-faith, reasonable effort as a matter of law unless it, in effect, pursues each and every lead it has "reason to believe" might assist in locating a missing witness.  See Dissenting Op. at 70, 71-72, 75, 77, 80-81, 84, 91, 94, 96-97, 99, 105.  Having crafted that rule, the dissent argues that because database searches are easy, the government was required to take the additional investigatory step of searching databases in an attempt to discover the boyfriend's address in Delaware.  Then, on top of that, the dissent surmises that if the government had used databases, it might have found an address for the boyfriend in Delaware, and then it might have found Vixama.  The dissent argues a "database search . . . stood a decent chance of leading the prosecution straight to the boyfriend—and likely, to Vixama."  Dissenting Op. at 64.

In short, because the government did not attempt to find the boyfriend's address through a database search, the dissent argues its efforts were unreasonable as a matter of law.  To be clear, the record contains no evidence that the boyfriend ever had an address in Delaware or that a database search would have revealed an address for him in Delaware.  No matter, we will nonetheless respond to the dissent's arguments that a database search might have revealed an address for the boyfriend in Delaware and, thus, the government's lack of a database search made its other efforts unreasonable as a matter of law.

44

Four responses.  First, and most telling, is that the Supreme Court in <u>Hardy</u> upheld the admission of the prior testimony and actually reversed the Seventh Circuit's conclusion that the prosecutor was required to take the additional investigatory steps identified by the Seventh Circuit.  One of those steps included failing to contact A.S.'s current boyfriend or her friends in the Chicago area.  Second, the Supreme Court did so even though the government had not served, or even attempted to serve, the witness A.S. with a trial subpoena in <u>Hardy</u>.

Third, here the prosecutor did follow up on the boyfriend lead and contacted the boyfriend through Vixama's former attorney (as opposed to using databases).  Through Vixama's former attorney, the government successfully sent the trial subpoena to the boyfriend, who was reportedly with Vixama, and then the government heard back that Vixama "will cooperate."[13]  Fourth, as explained below, the dissent's conclusion that the government made an unreasonable effort as to the boyfriend amounts to Monday-morning quarterbacking of the prosecutor and Agent Nowicki's efforts in hindsight in favor of the dissent's preference for how they should do their jobs.  Clearly, this is not a case where the government took no action when presented with a new lead.

---

[13]Later on in her dissent, our colleague finally acknowledges that she "do[es] not argue that Vixama did not receive" the trial subpoena from her boyfriend before trial.  Dissenting Op. at 80.

In short, in both <u>Roberts</u> and <u>Hardy</u>, the Supreme Court upheld the trial court's admission of prior recorded testimony of a witness who did not appear at a criminal trial. It is our majority opinion—upholding the admission of Vixama's videotaped deposition testimony—that comports with the Supreme Court's decisions in <u>Roberts</u> and <u>Hardy</u>, not the dissent.

**B.      Dissent's Flawed Analysis of What Constitutes a Good-Faith, Reasonable Effort**

The dissent's analysis too narrowly constricts the type of efforts that may qualify as a good-faith, reasonable effort in a Confrontation Clause case. For example, instead of crediting his efforts, the dissent chastises Agent Nowicki for not personally going to the home of Vixama's uncle in Coral Springs, Florida to look for her and for requesting the assistance of ICE ERO in Miami. Certainly, Agent Nowicki and the prosecutor, not ICE, had the responsibility to produce their own witnesses at trial. But that does not mean Agent Nowicki should not have sought the help of ICE ERO in doing so. (In fact, had Agent Nowicki neglected to contact ICE ERO, we have little doubt that the dissent would now add this omission to her list of fault-finding.) The dissent ignores that the material witness complaint was dismissed after the deposition, that Vixama had committed no crime, and that Agent Nowicki had no warrant to take her back into custody. Instead, it was only ICE that held a detainer. Although the dissent apparently disagrees, we think it was plainly reasonable for Agent Nowicki to ask ICE to help

46

locate Vixama, given that the detainer allowed ICE to take her back into custody. Agent Nowicki sought ICE's assistance not once, but twice. ICE assisted Agent Nowicki the first time, but, through no fault of Agent Nowicki, said it lacked manpower to go back to the uncle's house a second time.[14]

Further, instead of crediting the prosecution's successful efforts in getting the trial subpoena to Vixama, the dissent excoriates Agent Nowicki and the prosecutor for not finding the boyfriend's address in Delaware and for calling him only twice. Repeated ten times, the dissent's mantra is "find the boyfriend's address in Delaware, find Vixama." Dissenting Op. at 64, 77-78, 79, 80, 81, 86, 87, 91, 97, 105.

The dissent's rhetorical flourish ignores the facts and reality of this case. First, similar efforts had already failed in Florida. Indeed, "find the uncle's address, find Vixama" had entirely failed. When Agent Nowicki on February 7 learned of Vixama's release on February 6, her uncle in Florida was a promising lead to find Vixama because before her mistaken release, Vixama personally had given Agent Nowicki her uncle's telephone number. As noted earlier, Agent Nowicki then worked to find an address for Vixama's uncle in Coral Springs and

_____

[14]It is worth repeating that this is a criminal, immigration-smuggling case and the case agent, Agent Nowicki, worked for Homeland Security Investigations within the Department of Homeland Security. After Vixama was released and not deported, Agent Nowicki appropriately turned to ICE, who had the detainer, for help in locating her and in securing her presence for trial.

47

then successfully secured the assistance of ICE ERO in going to the uncle's house to locate Vixama.  But despite that good lead in the local Florida jurisdiction, ICE ERO on February 21 searched the uncle's home and looked for Vixama, to no avail given her relatives' lack of cooperation.  Given that failed outcome in Florida, it is unclear why Agent Nowicki would think that even if he got lucky and found the boyfriend's address in Delaware, the latter would reveal Vixama's whereabouts and help ICE snatch and jail her in Delaware.

In fact, let's unpack the multiple investigatory steps necessarily underlying the dissent's mantra of: "find the boyfriend's address in Delaware, find Vixama." Attorney Raben first sent the boyfriend's name and telephone number to the prosecutor on Saturday, April 15.  The trial began on Monday, April 17.  By 1 p.m. on Friday, April 21, both the government and the defense had rested.[15]  Even if we accept that a database search might have revealed a street address for the boyfriend in Delaware, the government would still have faced other investigatory hurdles under the particular facts of this case.  Miami federal officials would have had to secure the ready help of either their federal HSI counterparts, or state law enforcement, in Delaware to attempt to find the boyfriend at that street address. The federal HSI agents, or state law enforcement, in Delaware would then have had to get lucky and actually find the boyfriend at that address, and then persuade

---

[15]See timeline recap in footnote 20, infra.

48

him to reveal Vixama's whereabouts so they could more formally serve the trial subpoena on Vixama. Assuming that the boyfriend would help them find the girlfriend he had presumably been hiding, ICE ERO, which had the detainer, would have to be on the spot at just the right moment to grab her, else Vixama would once again go on the run. (Vixama had not yet failed to appear at the trial for the bench warrant to issue.) The reality is that the dissent's mantra sounds easy until one actually goes step-by-step through this process that the dissent says is mandated by her reasonableness standard as a matter of law.[16]

Contrary to the dissent's touted tactics, the government used the boyfriend lead in a different, more strategic way. The government tried to work with the boyfriend through Vixama's former lawyer to get the trial subpoena to Vixama and tried to have her cooperate. The government successfully did so and, right before trial, the former lawyer even reported back on April 15 that she "will cooperate."[17]

_____

[16]Although acknowledging that attorney Raben sent the prosecutor the boyfriend's name and phone number on Saturday, April 15, the dissent does not precisely identify what the next steps would be if the government found the boyfriend's address and if it then persuaded him to reveal Vixama's whereabouts. It is unclear whether the dissent is saying the government (1) could then formally serve the trial subpoena on Vixama in Delaware or (2) attempt to take Vixama into custody in Delaware and have her held and transferred back to Miami for trial (during the week of April 17 to 21). So we consider both possibilities.

All of this also assumes that ICE would timely transfer Vixama in custody back to an immigration facility in Miami and then to the custody of the U.S. Marshals' Service for trial. In any event, the dissent's approach—find the boyfriend's address—actually further underscores the reasonableness of the government's efforts to work through Vixama's former lawyer.

[17]The dissent's lecture in footnote four about the obvious and undisputed different jobs, roles, and interests of ICE ERO and the prosecutor is a red herring. The dissent throughout ignores that ICE already had a detainer to take Vixama into custody, the material witness complaint was dismissed after the deposition, and the prosecutor and Agent Nowicki had no pre-

Getting the trial subpoena to Vixama through her boyfriend and former lawyer was not a meaningless effort, as the dissent would have it, but was a significant, reasonable effort given that the boyfriend appeared to be voluntarily communicating on Vixama's behalf with her former lawyer. Because it appeared that the boyfriend (and Vixama through him) was cooperating with attorney Raben, it was reasonable for the government to rely on attorney Raben to communicate with him rather than to try to track the boyfriend down independently through databases and try to persuade him to help federal law enforcement take Vixama into ICE custody in Delaware and transfer her to Miami for trial. Pursuing the boyfriend and Vixama through her former lawyer, who had represented her in the same matter, had every indication at the time of being more fruitful than the "search and lock-her-up" maneuvers advocated by the dissent with

trial warrant to take Vixama into custody in Delaware; to secure her presence at trial, they would need to ask ICE to help them capture her in Delaware and transfer her back to Miami for trial.

The dissent's suggestion in footnote four—that we should not consider at all the ICE ERO's efforts to locate Vixama in our good-faith effort analysis—also runs afoul of the Supreme Court's clear mandate that we evaluate the reasonableness of the government's efforts to obtain a witness by looking to the totality of the factual circumstances of each particular case. See, e.g., Roberts, 448 U.S. at 75-77, 100 S. Ct. at 2543-45 (basing its reasonableness determination on all the "facts presented"). In addition, we are loathe to suggest that government agencies cannot work together to accomplish a common goal—here, find Vixama—even if the agencies' ultimate "interests" are not perfectly aligned. The dissent also misapprehends the significance of the ICE ERO agents' trip to Vixama's uncle's house. It is not that the ICE ERO agent's attempt to find Vixama relieved the prosecution of its obligation to make a good-faith effort to obtain her presence at trial. What is significant is that, at the uncle's house, the ICE ERO agents got the runaround from her relatives, who were not helpful at all in assisting them to locate her. Context is important. Because of that interaction, it was manifestly reasonable for the government to reach out to Vixama's former counsel for assistance in trying to find her, rather than again approaching her relatives.

50

the benefit of hindsight. Given the record as a whole and all the investigatory steps that had to succeed to capture her in Delaware on the immigration detainer (before the bench warrant issued on April 19), the government has shown that its working through her former attorney before the trial was a good-faith, reasonable effort to get the trial subpoena to her and to secure her presence at the trial.

Another flaw in the dissent's critique is the contradictory treatment of the boyfriend. On one hand, the dissent advocates that the boyfriend was key to locating Vixama. But on the other hand, the dissent complains that the trial subpoena was emailed to the boyfriend, who apparently could not be trusted to give the document to Vixama (but who could be trusted to hand Vixama over to the police), instead of serving the subpoena on Vixama, whose whereabouts were unknown. Specifically, the dissent complains that the government's communication of the trial subpoena to Vixama's former lawyer and then to her boyfriend "is not 'service' under the Federal Rules of Criminal Procedure." Dissenting Op. at 80. Admittedly, the government's efforts did not succeed in having Vixama appear at trial, but we cannot conclude they were unreasonable. Indeed, the dissent does not seem to contest that Vixama actually received the trial subpoena through the government's efforts in contacting her former lawyer or that, given the trial subpoena, the district court properly issued a bench warrant when Vixama failed to appear on April 19 during the trial.

51

While the dissent presumably would have taken different actions had the dissent been the case agent or the prosecutor in this case, the Sixth Amendment does not require the prosecution to exhaust every possible means of producing a witness at trial, and in hindsight it is also possible to think of "additional steps" the prosecutor might have taken.  See Roberts, 448 U.S. at 75-76, 100 S. Ct. at 2544; see also Hardy, 565 U.S. at 71-72, 132 S. Ct. at 495.  Our role is not to Monday-morning quarterback, but instead to assess whether the agent's and the prosecutor's actions constituted good-faith efforts that fell within a zone of reasonableness.  We conclude that the government's actions met this test.

Still another flaw in the dissent's critique is its isolation of the actions of Agent Nowicki and the prosecutor, without considering their efforts cumulatively.  The dissent contends the government's efforts were unreasonable because Agent Nowicki considered the fact that Vixama's videotaped deposition was already taken.  While the Agent candidly admitted he considered that fact, he also testified that he took other steps outlined above and, ultimately, he weighed multiple other factors, including that: (1) she had received a subpoena (through her boyfriend), (2) he had attempted to contact her boyfriend on several occasions, (3) she was in the country illegally, (4) there was no longer a criminal action against her for the Agent to take her into criminal custody, and (5) ICE was the only agency who

52

could take her into custody before she failed to appear at trial.[18]  We reject the

dissent's position that the government's cumulative efforts become unreasonable

simply because the case agent considers, as one factor in his continued efforts, that

a videotaped deposition is available.

In fact, neither the case agent, nor the prosecutor, nor this Court is required

to pretend Vixama was never deposed for the express purpose of having her

deposition presented at trial as allowed for deported aliens under 8 U.S.C.

---

[18]In relevant part, Agent Nowicki's testimony was as follows:

Q:    And since April 15th, there have been no attempts to ascertain an address
      in Delaware by running this gentleman's name?

A:    Not by me.

Q:    And, basically, the reason for that is because you assumed that she's
      already given the videotaped deposition, you didn't really need to try to
      find her?

A:    There are various reasons.  That's one of them.  The other one is there are
      many issues when it comes to her immigration status and how long—if
      she's taken into custody, how long it would take the process for her to go
      from an immigration facility in Delaware to make it to Miami.  She'd been
      made aware of the consequences of not showing up for trial.  She had been
      served with a subpoena.  I had attempted to contact the boyfriend on
      several occasions.

. . . .

Q:    Okay.  So you were aware that she was missing since—that she had been
      released into the community since February 6th, but, at that time, you
      thought that, because the government already had the deposition, that that
      would be sufficient for trial.  Is that correct?

A:    That was not my basis for not personally looking for her.  She at that point
      was present in the country illegally.  There was no criminal action against
      her.  So she was not my responsibility.  So that, combined with knowledge
      that we do have a video deposition—I guess those were some factors.  But
      I can't point to one factor why I didn't personally go look for her.  There
      are numerous factors.

53

§ 1324(d). This was not testimony presented at a preliminary hearing or on the off-chance the witness might become unavailable later. Rather, the defendants' counsel cross-examined Vixama as if she were testifying at trial because everyone assumed this would be her testimony at trial. For sure, the defendants have not waived their Confrontation Clause claims, and prior cross-examination alone cannot substitute for the government's burden to establish a witness is unavailable. See Crawford, 541 U.S. at 59, 124 S. Ct. at 1369. But the entire factual context here is relevant and important.

The dissent segregates one-by-one the facts used in our analysis and contends we are using that one fact to somehow "excuse" or "relieve" the government of its obligation to make reasonable efforts to secure Vixama's presence at trial. See, e.g., Dissenting Op. at 84-102. Nothing could be further from the truth. We have taken great pains to emphasize there are no brightline or per se rules when evaluating the government's good-faith efforts. Lest there be any confusion, we reiterate that we reach our conclusion that the government's efforts here were reasonable only after considering all of the particular circumstances of this case together—that is, in their totality or cumulatively.

In sum, our majority opinion faithfully follows that fact-bound reasonableness standard, as it must. And given the totality of the circumstances here, the government has demonstrated that it made good-faith, reasonable efforts

54

to obtain Vixama's presence at trial.[19]  We readily agree with the district court in

Miami, who carefully considered the case, conducted a hearing outside the

presence of the jury, and found that Vixama was "unavailable" before admitting

Vixama's videotaped deposition on the last day of the trial.[20]

## C.     Dissent's Citations to our Sister Circuits

The dissent cites four decisions from our sister circuits.  We take the time

and space to set forth in great detail the facts of those decisions because an

---

[19]The dissent's arguments about the burden of proof are unfounded.  The majority opinion expressly states: "The Supreme Court has also held that the prosecution bears the burden to show it made a good-faith effort to produce the witness."  See supra at 25 (citing Roberts, 448 U.S. at 74-75, 100 S. Ct. at 2543).  Nothing in the majority opinion shifts the burden of proof to the defendants.

[20]Later on, the dissent finally acknowledges that (1) "the government was right to contact Vixama's former attorney" and try to go through him before the trial began, and (2) she does "not argue Vixama did not receive" the trial subpoena from her boyfriend.  Dissenting Op. at 80, 90.  But then the dissent mistakenly argues that the government had sufficient time to find the boyfriend's address and locate Vixama during the 5-day trial week.  See Dissenting Op. at 90-91.

This ignores the timeline about the bench warrant.  To recap, the trial subpoena "commanded" Vixama to appear for trial on April 19.  On Saturday, April 15, attorney Raben emailed the prosecutor advising that he believed Vixama "will cooperate."  The trial began on Monday, April 17, with jury selection that day.  On Tuesday, April 18, the jury was sworn and, after opening statements, the government presented four witnesses.  On Wednesday, April 19, the government presented seven witnesses.  When Vixama did not appear on Wednesday, April 19, the trial court issued the bench warrant that day around noon.

On April 20, the government presented Francois's deposition and two witnesses.  After that, the district court held a hearing about Vixama's deposition, found her "unavailable," and concluded the deposition was admissible.  On Friday, April 21, the trial resumed at 9:40 a.m., and the government presented Vixama's deposition and rested its case by 11:50 a.m.  By approximately 1 p.m., the defense had presented its evidence and also rested.

There was at best a 48-hour window between the issuance of the bench warrant around noon on April 19 and the close of the defendants' evidence around 1 p.m. on April 21.  This is why the majority opinion properly focuses on the government's multiple efforts prior to the beginning of the trial to locate Vixama with ICE's help right after her release in February and again in March and then in April to send her the trial subpoena through her former attorney in an effort to have Vixama cooperate and appear for trial.

55

awareness of those facts negates the dissent's reliance on these cases for her

argument that the district court erred in admitting Vixama's videotaped deposition.

The dissent cites Cook v. McKune, where the defendant Cook, convicted of

first-degree murder, received a sentence of life without parole.  Cook, 323 F.3d at

828.  These six facts were important to the Tenth Circuit's reversal in Cook: (1) the

trial court had admitted the preliminary hearing testimony of the missing witness

Rudell; (2) Rudell was the only witness to testify that Cook committed the murder;

(3) though a trial subpoena was issued, no attempt was ever made to serve process

on, or even send the subpoena to, Rudell; (4) Rudell had been granted immunity in

exchange for his cooperation, and thus the Court said he had a special reason to

favor the prosecution; (5) Cook had not had an adequate opportunity to cross-

examine Rudell at the preliminary hearing; and (6) Rudell lived on social security,

which is how the government originally tracked him down for the preliminary

hearing, but the government made no effort to locate him (through Social Security

records or otherwise) to appear at trial.  Id. at 826-28, 832, 834-37, 840.

In light of these highly specific facts, the Tenth Circuit concluded the

government's "feeble exertions" could not "be called a good-faith effort."  Id. at

840.  Obviously, the facts in this case in no way resemble the facts in Cook.

Without setting forth any of its facts, the dissent also cites McCandless v.

Vaughn, another first-degree murder, life sentence case, where the government

56

also used the preliminary hearing testimony of Barth, the only eyewitness to the murder, at trial. 172 F.3d at 258-59. Witness Barth, arrested in connection with the murder, agreed to serve as a cooperating witness in exchange for (1) being released on bail and (2) having the charges against him dropped at the successful conclusion of that case. Id. After testifying at the preliminary hearing and being released on bail, Barth was rearrested twice for failing to appear, but the government did not seek to adjust the terms of his bail. Id. at 267-68. Barth was released again, and Barth failed to appear at trial. Id. at 268. The government did not contact Barth's father, who had served as the surety for Barth's bail. Id. at 268-69. The Third Circuit concluded that, given the seriousness of the murder charges, Barth's crucial importance as the only eyewitness to the murder, and his lack of impartiality, defendant McCandless had a very strong interest in confronting Barth at trial, and thus the government's efforts were insufficient. See id. at 266-70.

Unlike the witnesses in Cook and McCandless, the witness Vixama did not receive any consideration from the government for her testimony. Just the opposite. Vixama was to be deported back to Haiti, after having tried unsuccessfully to come here three times before. Also notable is the fact that this case did not involve a preliminary hearing, as in Cook and McCandless, but instead here the defendants themselves and their counsel were all physically present at the

57

videotaped deposition, which all expected to be admitted at trial and where defense counsel thoroughly cross-examined Vixama.

Also unlike Cook and McCandless, this is not an only-witness-to-a-murder case. Apart from Vixama's deposition testimony, there was compelling evidence that the defendants' boat was headed to the United States. The boat was 24 miles from Key Largo, Florida when found. The witness Francois (also on the boat) testified that (1) his father told him a trip was being planned to bring him to the United States, (2) other passengers told him the boat was headed to the United States, and (3) Francois likewise believed the boat was going to the United States. When the boat was adrift and out of food and fuel for six days, the defendants told the passengers not to use their cell phones and not to wave at other boats passing by. The prior criminal convictions of defendants Delancy (prior illegal reentry into the United States) and Smith (prior alien smuggling into the United States) were even introduced before the jury without any objection. Certainly, Vixama's testimony corroborated Francois's testimony that he believed the boat was headed to the United States, but Francois's testimony was direct and noncontradictory as well, with ample circumstantial evidence corroborating his testimony.

Without setting forth its facts, the dissent also cites United States v. Lynch, where the defendant was convicted of second-degree murder. Similar to Cook and McCandless, the district court admitted the preliminary hearing testimony of

58

missing witness Brown, the only eyewitness to identify defendant Lynch as the

shooter.  499 F.2d at 1014, 1020-21.  During the trial, a detective attempted to

locate Brown at a friend's apartment, but no one answered the door.  Id. at 1023.

Detectives returned to the apartment the following day, but did not find Brown.  Id.

It was later discovered that Brown had been in the friend's apartment when the

first detective knocked on the door, had stayed that night, and had left before the

second set of detectives arrived the next morning.  Id. at 1023-24.  The D.C.

Circuit concluded that the government's efforts were insufficient, pointing out

(1) that a preliminary hearing is less likely to produce extensive cross-examination

and impeachment of a witness than a trial,[21] and (2) that the missing witness was

---

[21]Because three cases cited by the dissent involved the use of a witness's testimony at a preliminary hearing, the D.C. Circuit's observation that it is less likely that a defendant will vigorously cross-examine an adverse witness at such a proceeding is worth noting.  A preliminary hearing is typically held after a defendant has been charged in a complaint, but before the government has obtained an indictment or information.  The purpose of a preliminary hearing is to ensure that the government has probable cause to proceed.  See Fed. R. Crim. P. 5.1 (a), (e)-(f).  Even if the court determines no probable cause exists, that ruling does not preclude the government from later prosecuting the defendant on the same charge.  Fed. R. Crim. P. 5.1(f).  For that reason, although the defendant has a right to cross-examine all witnesses, Fed. R. Crim. P. 5.1(e), he may often have little incentive to thoroughly cross-examine an adverse witness.  Instead of attempting to cast doubt on the witness's testimony, a defendant may instead use his opportunity to question the witness as a means to obtain discovery as to the witness's account and the government's case.  And a defendant may be disinclined to aggressively question an adverse witness and thereby reveal his cross-examination strategy in advance of trial.

In stark contrast to a preliminary hearing, defendants in this case knew that Vixama would not be testifying at trial, that her deposition testimony would be presented to the jury, and that this deposition would be their only opportunity to cross-examine her.  Although we are dealing here with the question of an absent witness's availability at trial, so were the circuit cases cited by the dissent, and to evaluate fairly the applicability of those cases to our own, we must consider the entire factual context within which their decisions were made.

still within the jurisdiction of the district court.[22]  Id. at 1023-24.  Those two factors influenced the D.C. Circuit's decision and they are entirely absent in this case.  Indeed, the dissent does not disagree that the defendants' cross-examination of Vixama during her deposition testimony was thorough nor that Vixama was somewhere outside the Southern District of Florida.

We also discuss the Fifth Circuit's decision in United States v. Tirado-Tirado, 563 F.3d 117 (5th Cir. 2009), because the defendants cite it and the dissent discusses it too.  In our view, Tirado-Tirado, if anything, readily demonstrates why the government has shown a good-faith, reasonable effort here.  Five months before the defendant's trial, the parties took a videotaped deposition of a witness who everyone expected to return for trial.  Id. at 120.  The witness gave his contact information to his attorney, was released, and voluntarily returned to Mexico.  Id. at 120, 123.  Yet, notwithstanding the expectation that this witness would be needed at trial, the government failed to give the witness written notice regarding the trial date and failed to send him a subpoena.  Id. at 123.

Reversing, the Fifth Circuit emphasized that (1) the government had not attempted to remain in contact with the alien witness at all during the intervening five months (between the deposition and the trial), and (2) the government "did not

---

[22]Beyond the factual distinctions between this case and Lynch, it should also be noted that there was a vigorous dissent in Lynch to the ruling that the government's efforts were insufficient.  See Lynch, 499 F.2d at 1025-41 (MacKinnon, J., dissenting).

60

make any effort" to contact the witness to make concrete arrangements for his transportation from Mexico to the United States and his attendance at trial until only eight days before trial. Id. at 124-25. The Fifth Circuit concluded that "[t]he failure to make such minimal efforts demonstrates a lack of good faith on the part of the government," and as such, the alien witness was not unavailable for purposes of the Confrontation Clause. Id.

Unlike in Tirado-Tirado, the parties here never anticipated that Vixama would provide live testimony at trial. Rather, they took Vixama's videotaped deposition because she was a material witness in custody (although she herself had committed no crime), and after her deportation she would be unavailable to testify. By contrast, the parties in Tirado-Tirado took the alien witness's deposition only as a precaution, fully expecting that the alien witness would return to testify in person. See id. at 520. Given that understanding in Tirado-Tirado, the government could reasonably be expected to maintain at least some contact with the witness and ensure his appearance at trial. See Tirado-Tirado, 563 F.3d at 520; see also Siddiqui, 235 F.3d at 1325.

More importantly, in Tirado-Tirado, the government "made no effort" whatsoever to keep in touch with the alien witness or to remain apprised of his whereabouts in the over five months between the taking of his deposition and the trial. Id. at 125. The government "made no effort" to contact the witness, despite

having access to the witness's contact information through his attorney.  Id.  In contrast, as soon as Agent Nowicki discovered that Vixama had been released in February 2017, he began trying to locate her by contacting her uncle—the only connection Vixama indicated she had in the United States.  Later that month (February), at Nowicki's request, ICE ERO agents went to the uncle's house to search for Vixama, and then in March, Nowicki reached out to ICE ERO again to see whether Vixama had turned up.  In short, though the rest of the government's efforts to locate Vixama took place in early April, the government here also took earlier steps in February and March to locate her.

In other words, this is not a case in which the government "made absolutely no effort" to locate Vixama and obtain her presence at trial after learning of her mistaken release from custody.  See id.; see also Barber, 390 U.S. at 723, 88 S. Ct. at 1321.  This is also not a case where the government did nothing to locate or keep in touch with a witness for over five months.  The Fifth Circuit's decision even pointed out "[t]he inevitable question of precisely how much effort is required on the part of the government to reach the level of a 'good faith' and 'reasonable' effort eludes absolute resolution applicable to all cases."  Tirado-Tirado, 563 F.3d at 123 (internal quotations marks omitted) (emphasis added).

We agree with the Fifth Circuit that there is no brightline standard applicable to all cases and the facts of each case matter.[23]  Reasonableness is a highly fact-specific inquiry.  Under the totality of the unique factual circumstances of this case, we conclude that the district court did not err in admitting Vixama's videotaped deposition.  The government made multiple good-faith efforts to secure Vixama's presence at trial and its efforts fell within the permissible zone of reasonableness.  We are not persuaded by the dissent's position to the contrary.

## VII. CONCLUSION

For the foregoing reasons, we affirm Smith's and Delancy's convictions.

**AFFIRMED.**

---

[23]The dissent charges that the majority opinion creates an "unconstitutionally low (and unpredictable) bar for what constitutes 'reasonable' effort to find a witness."  Dissenting Op. at 65.  Not so.  For determining reasonableness, the majority opinion eschews brightline rules and follows the fact-specific and case-by-case approach for determining "reasonableness" based on the totality of the circumstances, which is what the Supreme Court has instructed us to do.

Although the dissent cites the circuit cases discussed in this last section, the dissent reproves our summarizations of the facts in Hardy, Roberts, and the above four sister circuit decisions for spending "pages laboriously summarizing the cited cases" and "for what seems like little purpose" to the dissent.  Dissenting Op. at 98 n.33.  While the dissent prefers her brightline rule, we explicate these decisions (cited in her dissent) because they each exemplify the fact-specific and case-by-case approach to reasonableness followed by the Supreme Court and other circuits.

63

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

Law enforcement had a fresh, promising lead for finding Vanessa Armstrong Vixama—a crucial witness.    Vixama's former attorney had informed the government that Vixama was with her boyfriend in Delaware.  He also had given the government the boyfriend's name and phone number.  A simple, routine database search for the boyfriend's address stood a decent chance of leading the prosecution straight to the boyfriend—and likely, to Vixama.  But the prosecution did not conduct a database search.  Nor did it attempt in any other way to find the boyfriend. Instead, the prosecution, over a span of days before trial, called the boyfriend once and sent him a single text.  When the boyfriend did not respond, the prosecution did nothing more before trial to reach him.  Even after trial began, the prosecution did nothing more than call the boyfriend one more time.  Though no one responded, the government simply stopped looking for Vixama.[1]

The Sixth Amendment demands more from the government.    So does Supreme Court jurisprudence.  After all, Delancy's and Smith's Sixth Amendment right to confront Vixama at trial was at stake.

---

[1] Agents have many responsibilities, and I do not mean to suggest that the agent here was lazy.  Rather, it appears he did not appreciate the scope of the efforts the Confrontation Clause requires to present a vital witness's live testimony, a circumstance that is understandable, in view of our Circuit's lack of prior reason to opine on the subject.  Nonetheless, this circumstance does not make the government's efforts any more reasonable from a constitutional standpoint.

Yet the prosecution asked the district court to admit Vixama's deposition testimony in lieu of her in-person testimony—even though it did not undertake reasonable, routine steps to follow up on its fresh, promising lead for finding Vixama. In support of its request, the government asserted that it had undertaken "reasonable" efforts to find Vixama and had failed, so Vixama was "unavailable" for trial.

Today the Majority Opinion applies a subjective I-know-it-when-I-see-it approach to uphold the government's lackluster efforts as reasonable and deprive Smith and Delancy of their right to the witness's presence at trial. This ruling creates an unconstitutionally low (and unpredictable) bar for what constitutes "reasonable" effort to find a witness. And in so doing, it incorrectly dismisses as surplusage the Sixth Amendment's independent right to the witness's presence at trial. I therefore respectfully dissent from the Majority Opinion's decision to admit Vixama's deposition testimony.[2]

I divide my discussion into four substantive sections. Section I considers the Confrontation Clause's right to confront the witness. It explains that when other reasonable and promising options remain, the right's "reasonableness" requirement

---

[2] Since the Majority Opinion affirms the district court's admission of Vixama's deposition testimony, the conviction will not be vacated, and the case will not be remanded on that basis. Under those circumstances, I concur in the Majority Opinion's affirmance of the district court's denial of a mistrial on the basis of the prosecutor's closing argument.

65

demands more than a couple calls and a text before a witness may be declared unavailable and her preserved testimony presented at trial. Section II applies the proper standard to the facts here, revealing the inadequacy of the government's efforts. Section III examines the errors in the Majority Opinion's analysis. And Section IV concludes that the erroneous admission of Vixama's preserved testimony was not harmless error.

## I.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right to confront encapsulates two independent rights: the right to cross-examine the witness and the right to the witness's appearance at trial. *See United States v. Crawford*, 541 U.S. 36, 59 (2004) ("Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.").

These rights work in different ways to test the witness's truthfulness. The right to a witness's live testimony protects a defendant's Sixth Amendment rights in ways that a cross-examination conducted outside the crucible of a trial cannot. By ensuring that the witness is in the courtroom and testifying under oath in front of the judge, the jury, and the defendant, the Clause impresses upon the witness the

66

seriousness of the matter and discourages the witness from lying—in a way that cross-examination at a deposition does not.  *See California v. Green*, 399 U.S. 149, 158 (1970); *see also Barber v. Page*, 390 U.S. 719, 721 (1968) (explaining that, unlike cross-examination outside of trial, the presence of the witness at trial compels the witness "to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief") (citation and internal quotation marks omitted).  Relatedly, when the witness is in the courtroom, the jury can closely scrutinize the witness's demeanor and mannerisms in the judge's and jury's presence to determine the witness's credibility.  *Ohio v. Roberts*, 448 U.S. 56, 63-64 (1980), *abrogated in part on other grounds by Crawford*, 541 U.S. at 60-69.

So consequential is the right to confront the witness, the Supreme Court has expressed the view that a failure to allow proper confrontation calls the ultimate integrity of the fact-finding process into question.  *Roberts*, 448 U.S. at 64.  The integrity of the fact-finding process is at stake, of course, because the Confrontation Clause is a procedural protection.  *See Crawford*, 541 U.S. at 61.  So just as we cannot skip a trial, even if we think a defendant is obviously guilty, we cannot skip over the defendant's right to a witness's presence at trial, even if we think the witness's prior recorded testimony is obviously reliable.  *See id.* at 62.

67

Of course, the right to a witness's presence at trial is not absolute. But given the significance of a defendant's constitutional right to confront the witness at trial, we do not lightly cast away that right. Before disposing of a defendant's constitutional right to confront a witness, we must be sure that two independent conditions have been met. The defendant must have had an opportunity to cross-examine the witness, and the witness must be "unavailable." *See Crawford*, 541 U.S. at 59. So the fact that a thorough cross-examination has occurred is not enough to justify proceeding by recorded testimony, without the witness at trial. Here, only the availability of the witness is at issue.

A witness is "unavailable" when the government cannot secure the witness's presence at trial, despite its good-faith, reasonable efforts. *Roberts*, 448 U.S. at 74. So what does that mean in practical terms?

Fortunately, we do not write on a blank slate as to what constitutes reasonableness. The Supreme Court has said that the government need not undertake futile tasks. *Id.* So if no possibility of procuring a witness exists—the example the Supreme Court used for such a circumstance was when the witness died—the government does not need to do anything. *Id.* On the other hand, "if there is a possibility, albeit remote," that affirmative steps might produce the witness, then the government may need to take those steps. *Id.* In determining whether the government must engage in actions falling into this category, the Supreme Court has

68

explained that "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Id.* at 76 (quoting *Barber*, 390 U.S. at 724).

In *Hardy v. Cross*, 565 U.S. 65 (2011), the Supreme Court revealed a critical distillation of these principles: under that case, the government must follow up on current, promising leads to find a witness, where reasonable methods to do so exist. In *Hardy*, the state introduced at trial the recorded testimony of a witness who was missing at the time. *Id.* at 68. Before the state court declared the witness "unavailable" and allowed the use of her preserved testimony, the prosecution did not contact the witness's boyfriend or any of her other friends in the Chicago area at the time, nor did the prosecution inquire at the cosmetology school where the witness had once been enrolled, concerning the witness's whereabouts. *Id.* at 70-71. The defendant Cross was convicted.

After exhausting his state appeals, Cross filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He argued that the state courts had unreasonably applied Supreme Court precedent concerning the Confrontation Clause's unavailability requirement. *Id.* at 69. The Supreme Court ultimately disagreed, primarily because, under the Antiterrorism and Effective Death Penalty Act's ("AEDPA") standard of review, it concluded that the state court's decision was "reasonable," so it deferred to that determination. *Id.* at 72. Of course, we apply a

69

*de novo* standard of review here on direct appeal, in contrast to the deferential standard that was applicable in *Hardy*. But *Hardy* is nonetheless instructive.

True, the Supreme Court held that the state court had acted reasonably in denying Cross's unavailability claim under the Confrontation Clause. But its explanation for why provides the governing principle. Concerning the state's failure to contact the missing witness's boyfriend or any of her friends in the area, the Supreme Court reasoned that none of the victim's "family members or any other persons interviewed by the State provided any reason to believe that any of these individuals had information about [the victim's] whereabouts." *Id.* at 71. As for the state's failure to make inquiries at the cosmetology school where the witness had been enrolled, the Supreme Court similarly explained that the victim had not attended the school "for some time," so there was "no reason to believe that anyone at the school had better information about [the victim's] location than did the members of her family." *Id.*

These explanations for denying *Hardy*'s claim suggest that even when the government's actions are viewed through the highly deferential lens of AEDPA, the government must still follow up on leads if it has "reason to believe" those leads can assist in locating the witness. (And actually, in *Hardy*, when the witness's mother told the prosecution that the witness could be staying with an ex-boyfriend in Waukegan, Illinois, the prosecution followed up by visiting the Waukegan address

70

and speaking with the ex-boyfriend's mother. *Id.* at 68.)  Here, though, a *de novo* standard governs.  So the government's failure to undertake reasonable steps to follow up on leads that provide "reason to believe" they may succeed in locating a missing witness certainly cannot satisfy the Sixth Amendment's reasonableness standard.

Yet today, the Majority Opinion allows exactly that.  To arrive at this mistaken conclusion, the Majority Opinion completely fails to account for *Hardy*'s reasoning.  In fact, it does not even attempt to show that *Hardy* does not suggest the government must undertake reasonable steps to follow up on promising leads.[3]  Instead, the Majority Opinion dismisses my analysis of *Hardy* by simply reciting a lengthy summary of *Hardy*'s facts—just to make two points I readily agree with:  that the government does not need to take *every* step to secure a witness and that reasonableness depends on the facts of the case.  Maj. Op. at 40-43.  But significantly, nothing in these two points contradicts the lesson *Hardy*'s logic and

---

[3] The Majority Opinion distorts my discussion of *Hardy*'s lesson.  As I explain, *Hardy* teaches that the government needs to make ***reasonable*** efforts to follow up on promising leads.  The Majority Opinion instead claims that I assert a rule that requires the government to take even ***unreasonable*** steps to follow up on promising leads.  Maj. Op. at 43 (claiming that the dissent's rule is "that the government does not make a good-faith, reasonable effort as a matter of law unless it, in effect, pursues ***each and every*** lead it has 'reason to believe' might assist in locating a missing witness." (emphasis added)).  To be clear, that is not correct.  I am ***not*** suggesting that the government needs to take unreasonable steps to pursue "each and every" promising lead.  Under *Hardy*, the government must undertake only ***reasonable*** efforts—meaning reasonable tasks under the circumstances—to pursue promising leads calculated to find a missing witness.  Indicators of reasonableness can include, for example, cost, time requirement, and ease of task, under the circumstances.  So where a promising lead exists, performing a free or inexpensive database search for an address, which takes just minutes, is reasonable.

71

context teaches:    that "reasonable efforts" means the government must take reasonable steps to follow up on a promising lead.

## II.

## A.

In violation of *Hardy*'s lesson, the Majority Opinion incorrectly excuses the government's failure to undertake reasonable steps to follow up on leads that provide "reason to believe" they may succeed in finding a witness.  To explain why the Majority Opinion's analysis cannot be correct, I first revisit the key facts concerning the government's search for Vixama.

After immigration authorities accidentally let Vixama go in the United States, the case agent obtained Vixama's uncle's address and passed it along to Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO"). Two weeks after it received that information, ERO went to the uncle's address to search for Vixama but came up empty handed.  ERO said it "felt like they were getting the runaround" from an occupant of the house, since the occupant told ERO that she was not "sure" if Vixama was living there.

It wasn't until the next month, March, before the case agent followed up with ERO for an update on Vixama.  At that point, ERO informed the case agent that it was not going to look for Vixama again.  Despite this news, the government again waited another month before acting.

Five days before trial, on April 12—the same day the government advised the court at the calendar call that it intended to introduce Vixama's deposition testimony at trial—the government emailed Vixama's former attorney to ask if he had Vixama's phone number or knew where she was residing. The next day, Vixama's attorney informed the government that Vixama was in Delaware with her boyfriend. In response to this information, the government simply emailed Vixama's former attorney a subpoena for Vixama, which the attorney forwarded to Vixama's boyfriend.

On April 15, the attorney provided the name and phone number of Vixama's boyfriend to the government, advising that the government could "call [Vixama] now at [the boyfriend's] number" and that he "believe[d] she w[ould] cooperate." The government quickly learned that was not to be the case. When the agent called the boyfriend's number on April 15, no one answered, and no one returned the call. The agent followed up with a text, which also was not returned. That one call and one text consisted of the totality of the government's efforts to reach Vixama's boyfriend before trial.

The government knew what this meant. Indeed, the government understood at least as early as the very first day of trial—April 17—that Vixama was not going to appear, since it advised the court that it continued to consider her "unavailable"

73

after having previously indicated on April 12 that it intended to use her deposition testimony.

Even after trial began, the government did nothing more to reach the boyfriend than to try his number one more time. As late as the fourth day of trial, when asked whether the government had run the boyfriend's name through any database or had otherwise made any attempt to find his address, the case agent responded, "Not yet."

**B.**

The government's efforts to search for Vixama—a witness crucial to the government's case—suffer from serious shortcomings. I begin with the government's efforts during February and March 2017, the period after the government learned that Vixama had been released and before the government's April pretrial efforts. During this time, the government lost nearly two months after ERO's single, unsuccessful February visit to the uncle's residence,[4] doing nothing

---

[4] Given the difference in the prosecution's and ERO's interests in finding Vixama, it is, at best, questionable whether we should consider among the prosecution's efforts to present Vixama's testimony at trial ERO's limited efforts to locate Vixama after she was released from custody. I certainly do not suggest that Homeland Security Investigations could not elect to have ERO find Vixama and deport her. And had it done so successfully, there would have been no problem with having Vixama declared unavailable. Nor, as the Majority Opinion incorrectly asserts, do I suggest that "government agencies cannot work together to accomplish a common goal." Maj. Op. at 49 n.17. Of course they should. And as I have noted, had they succeeded and had ERO deported Vixama, Vixama would, in fact, have been unavailable for Sixth Amendment purposes. But that's not what happened here. So we must evaluate the efforts of the government *to present Vixama at trial.* And by definition, Homeland Security Investigations's efforts to have ERO find Vixama were not efforts to obtain Vixama's appearance at trial. In cases where a witness is illegally present in the United States, two agencies have different interests in the witness: the agency prosecuting the case—be it Homeland Security Investigations, the Federal Bureau of Investigation, or any other federal agency—and ERO. The agency prosecuting the case bears the

to look for Vixama. It could have followed up with the uncle by sending an agent to the uncle's address to look again for Vixama and to question the uncle. But it did not do so—even though as late as within a week of the trial, the agent thought Vixama was "perhaps" living at her uncle's home in Coral Springs. So the government had at least some reason to believe it might find Vixama with her uncle.

The government's stated reasons for its inaction were insufficient under Supreme Court precedent. According to the case agent, he declined to ask another Homeland Security Investigations ("HSI") agent from an office closer to the uncle's residence to take a second look for Vixama at the uncle's house because he "could have been turned down." But that is just another way of saying those efforts could

---

responsibility of producing all necessary government witnesses for trial—even if they are present in the United States illegally. But ERO's mission, in contrast, is to enforce the immigration laws and deport illegal aliens once they have been designated for deportation. The prosecuting agency and ERO generally coordinate their efforts to avoid the premature deportation of a necessary trial witness. But because of the human cost of forcing material witnesses to suffer detention, and because of the financial and physical burdens on the government to detain innocent witnesses, ERO's interest in removal is sometimes prioritized over the prosecuting agency's interest in producing the witness at trial. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 865 (1982) (explaining that human costs and burdens on the government justify prompt deportation of unnecessary witnesses).

If, however, as happened here, ERO is unwilling or unable to perform its removal responsibility, that does not absolve the prosecuting agency of its obligation to produce the witness for trial. The Majority Opinion elides the distinctions between the functions and responsibilities of the prosecuting agency, on the one hand, and ERO, on the other, and, in assessing the reasonableness of the government's efforts to produce the witness at trial, evaluates together ERO's and the prosecuting agency's efforts to fulfill their conflicting functions. But ERO does not engage in any affirmative efforts to make a witness available for trial; just the opposite—it strives to deport a witness designated for deportation. And if the witness has not been deported and is present at the time of trial, the prosecuting agency continues to bear responsibility for producing that witness—regardless of whether the witness is legally or illegally present in the United States.

75

have worked.  And as I have noted, the Supreme Court has held that "the possibility of a refusal is not the equivalent of asking and receiving a rebuff."  *Barber*, 390 U.S. at 724.

The case agent also said he curtailed his efforts to search for Vixama in part because he knew the government already had what it needed from Vixama:  her deposition testimony.  But the government's possession of recorded testimony cannot relieve the government of its obligation, under the Sixth Amendment right to the witness's presence, to engage in reasonable efforts to find the witness who offered it.  If it did, the Sixth Amendment's unavailability requirement would go the way of the eight-track tape player because the government's mere possession of preserved testimony would always end the government's duties to present the witness in person.

For this reason, it is not surprising that our sister Circuits have described "a good measure of reasonableness [as requiring] the State to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available."[5]  *See*, *e.g.*, *Cook v. McKune*, 323 F.3d 825, 836

---

[5] Under this test, the government's view of the importance of the witness and the seriousness of the crime necessarily modulate the amount of effort the government will undertake to find a given witness.  Here, it is clear the government would have tried harder to find Vixama if it had not had her deposition testimony, since Vixama was critical to the case, *see infra* at Section IV, and the agent admitted that he stopped trying to find her, in significant part, because the government already had her recorded testimony.

76

(10th Cir. 2003).[6] Yet here, the agent conceded he ceased efforts to find Vixama in significant part because the government already had her recorded testimony. That admission confirmed what the record already indicated: the government stopped well short of the efforts it would have undertaken to find Vixama—a witness even the agent deemed "essential," *see also infra* at Section IV—in the absence of Vixama's preserved testimony.

Nor did the government sufficiently step up its efforts as trial loomed closer. Unlike in *Hardy*, where nothing indicated that the witness's boyfriend, any of her friends in the Chicago area, or anyone at the cosmetology school had knowledge of her whereabouts, here, the government had good reason to believe that Vixama was with her boyfriend. The government also had the boyfriend's name and phone number. And while it's great that the government was able to secure some assistance from Vixama's former attorney by emailing him, proper follow-up also required performing routine and reasonable law-enforcement tasks pertaining to the name and

---

[6] *See also McCandless v. Vaughn*, 172 F.3d 255, 269 (3d Cir. 1999) ("If the prosecution had not had Barth's preliminary hearing testimony and had needed Barth's presence at trial, we are confident that the resources and effort devoted to finding him prior to trial would have been greater than they in fact were. To countenance such a disparity would ill serve the interests protected by the Confrontation Clause."); *United States v. Lynch*, 499 F.2d 1011, 1023 (D.C. Cir. 1974) ("In the ordinary case, [demonstrating that the government's search was "exercised both in good faith and with reasonable diligence and care"] will require a search equally as vigorous as that which the government would undertake to find a critical witness if it has no preliminary hearing testimony to rely upon in the event of 'unavailability.'").

number of the boyfriend, so the government could secure Vixama.[7]  Under *Hardy*, the government should have undertaken these reasonable efforts to follow up on this promising lead.

But it did not.  Rather than running a basic, routine, quick, and inexpensive database search of the boyfriend's name to ascertain his address—or, for that matter, trying to obtain the boyfriend's address in any manner—the government did no more than just engage in minimal efforts to twice call and once text the boyfriend.  No evidence suggests the government took even five minutes to check for the boyfriend's profile on Facebook, Twitter, or Instagram, or to punch his name into Google to see what those quick searches could dredge up.

Even when it became clear that the two calls and single text were not going to cut it, the government still did nothing more.  Instead, as late as the fourth day of trial, the case agent conceded that the government had "[n]ot yet" tried to find the boyfriend's address.  With the constitutional rights of two criminal defendants at

---

[7] The Majority Opinion sets up a false choice between relying on the former attorney to obtain Vixama's appearance and employing basic law-enforcement techniques to follow up on the lead of the boyfriend's name and number.  *See* Maj. Op. at 49-50 ("Because it appeared that the boyfriend (and Vixama through him) was cooperating with attorney Raben, it was reasonable for the government to rely on attorney Raben to communicate with him *rather than* to try to track the boyfriend down independently through databases and try to persuade him to help federal law enforcement take Vixama into ICE custody in Delaware and transfer her to Miami for trial." (emphasis added)).  Here, though, *Hardy*'s rule demanded the government do both because both showed promise of obtaining Vixama's appearance, and both were reasonable.

78

stake, it is fair to wonder what the government was waiting for. By comparison, teens trying to reach their crushes do more.

And here, Vixama was a crucial witness to the government's case. *See infra* at Section IV. Winning at trial would have been extremely difficult without her testimony. So we can be sure the government would have engaged in routine, basic, and inexpensive techniques to find Vixama if it had not had her recorded testimony. *See Cook*, 323 F.3d at 836. Its decision not to do so only further reconfirms the government's failure to satisfy the Sixth Amendment's reasonableness standard.

Yet the Majority Opinion concludes the government's efforts were nonetheless reasonable. In doing so, it relies on five of the reasons the case agent identified for his decision not to engage in further efforts to find the boyfriend: (1) he believed Vixama had received a subpoena (through her boyfriend); (2) he had attempted to contact her boyfriend by phone and text; (3) Vixama was in the country illegally; (4) a criminal action against Vixama was not pending, so the agent could not take her into criminal custody; and (5) ICE was the only agency that could take Vixama into custody before she failed to appear at trial. Maj. Op. at 51-52. In fact, though, the agent also admitted a sixth—that he did not think additional efforts were necessary, since the government already had Vixama's deposition testimony.

None of these reasons—alone or together—suffice to excuse the government from undertaking reasonable and routine efforts to ascertain the boyfriend's address

79

when the government had good reason to believe that Vixama was with the boyfriend.

I have already explained above why the existence of Vixama's deposition testimony could not relieve the government of its obligation to engage in reasonable efforts to find Vixama. *See supra* at 75-76 & n.29. I have likewise described why the agent's two unreturned calls and single text to the boyfriend did not extinguish the government's responsibility to undertake reasonable efforts to find Vixama. *See supra* at 76-77. Now I turn to the other four reasons the government set forth.

First, the emailed subpoena forwarded by Vixama's former attorney to her boyfriend did not relieve the government of its responsibility to engage in additional reasonable efforts to find Vixama under the circumstances here. Emailing a subpoena through third parties is not "service" under the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 17(d). And while I do not argue Vixama did not receive it, the subpoena did not have legal effect, so the agent's reliance solely on it was misplaced, since it became obvious shortly after the subpoena was sent that Vixama did not intend to honor it.

Importantly, though, that the government thought the boyfriend would pass the subpoena to Vixama has tremendous relevance to the reasonableness analysis; it underscores the fact that the government had reason to believe—and did in fact believe—Vixama was with the boyfriend in Delaware, as Vixama's former attorney

80

had advised the government.  So the government also had reason to believe that if it found the boyfriend, it would find Vixama.  And that required the government to undertake reasonable efforts to try to find the boyfriend.

Nor did Vixama's illegal presence in the country somehow absolve the government of satisfying the constitutional requirement to undertake reasonable efforts to find Vixama.  If it did, then the Confrontation Clause's right to the witness's presence at trial would have a hole large enough to drive a Bagger 293[8] through whenever the witness was illegally present in the United States at the time of trial.  Yet nothing in the Constitution or Confrontation Clause jurisprudence supports the notion that a defendant's Sixth Amendment right to the witness's presence at trial depends upon the witness's immigration status.

The government's excuses that no pending criminal action allowed the agent to take Vixama into custody and that only a bench warrant would enable it to produce Vixama fare no better.  Even assuming, *arguendo*, that no arrest warrant could be obtained,[9] that circumstance would not justify the government's failure to produce

---

[8] The Bagger 293 is an excavating machine that is 315 feet tall and 738 feet wide.  Wayne Grayson, *Meet the 31 million-pound bucket wheel excavator.  The largest land vehicle ever built*, https://www.equipmentworld.com/video-meet-the-the-31-million-pound-bucket-wheel-excavator-the-largest-land-vehicle-ever-built/ (last visited June 29, 2019).  It weighs more than 31 million pounds.  *Id.*  Despite its size, the vehicle requires only two people to operate it.  *Id.*

[9] While I respect and do not second-guess the government's decision not to charge Vixama with a crime, it is not technically accurate to suggest that the government had no option available to it to obtain a warrant for Vixama's arrest pretrial.  HSI could have obtained an arrest warrant for Vixama for entering the United States illegally.  *See* 8 U.S.C. § 1325(a) ("Any alien who (1) enters . . . the United States at any time or place other than as designated by immigration officers

81

Vixama. The government knew since February 7, 2017, that Vixama was in the country and had not been deported.

But it did not tell Smith and Delancy that for more than two months. In fact, the government waited until *the first day of trial*, April 17, to so inform them, failing even to reveal it at the calendar call on April 12. Instead, at the calendar call, without advising the court or Smith and Delancy that Vixama was still in the country, the government told the court that it intended to introduce Vixama's videotaped deposition. The court asked Smith's attorney if he was objecting to the video deposition's admission, and Smith's attorney, not knowing that Vixama was in the country, answered, "Clearly not. We've already had the opportunity to cross-examine."

So when the government finally revealed Vixama's presence in the country on the first day of trial, it was not surprising when Smith and Delancy objected. As Smith's attorney aptly put it, "[T]he whole notion of her being unavailable was because it was presumed that she would be deported and that would make her beyond the jurisdiction of the United States."

---

. . . shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both . . . ."). Clearly, it had probable cause to do so. And had it obtained such a warrant and arrested Vixama, it could have exercised prosecutorial discretion to drop the charges and deport her before trial with the consent of Smith and Delancy (in which case, she would have been unavailable) or to have her testify and then drop the charges and deport or release her.

82

Also on the first day of trial, the government told the court that it had sent a subpoena to Vixama through her former attorney to appear on the *third* day of trial, even though the government expected the trial to take only "[f]our to five days." But almost immediately after telling the court about the subpoena, the government betrayed its doubt that Vixama would comply with it, telling the Court, "At this point we still consider her unavailable." And no wonder, since beginning on April 15, the agent had called and sent a text to the boyfriend, and he had received no response at all.

Of course, nothing prevented the government from subpoenaing Vixama to appear on the first day of trial and obtaining a bench warrant then if she did not comply. At least that way, the government would have had the remaining five trial days (counting April 17) to execute the bench warrant. Instead, however, the government kept Smith and Delancy in the dark and unilaterally chose to limit itself to obtaining a bench warrant only when, by its own calculation, much of the trial would have already concluded. So to the extent that a bench warrant was the only way for the government to compel Vixama's attendance and that there was insufficient time to execute the warrant, the government put itself in that position. It cannot therefore benefit from that self-imposed disadvantage. And if the government had no intention of following up on the bench warrant in the first place,

83

that it even sought one is irrelevant to evaluating the reasonableness of the government's efforts.

Put simply, the government had reason to believe that undertaking routine law-enforcement steps to find Vixama by locating her boyfriend might well succeed. No reason the government offered for failing to take such steps undermines this fact. For this reason, the government's efforts to find Vixama were not "reasonable" under the Sixth Amendment's unavailability standard as the Supreme Court has construed it.

## III.

The Majority Opinion protests that I ask too much of the government. It throws a kitchen sink of rationalizations in its attempt to justify the government's failure to conduct routine tasks that it had reason to believe might locate Vixama. Specifically, the Majority Opinion argues that (1) it would be "Monday-morning quarterbacking" to predict whether finding the boyfriend would have led to Vixama, Maj. Op. at 44-45, 51; (2) the government was "plainly reasonable" in asking ERO for help, *id.* at 46; (3) it was reasonable for the government to rely on the former attorney to obtain Vixama's presence at trial, rather than engaging in its own efforts to find Vixama, *id.* at 49-50; (4) this dissent is internally inconsistent, *id.* at 50-51; (5) Vixama was cross-examined, *id.* at 53; (6) Vixama had great incentive not to be found, *id.* at 16, 30; and (7) caselaw supports the conclusion that the government's

84

efforts were reasonable. But even brief consideration of these arguments—both alone and together with each other—reveals the fallacy of them.

**(1) The Majority Opinion's "Monday-morning quarterbacking" criticism is riddled with flaws, most notably because it shows the Majority Opinion impermissibly shifted the burden of proof onto Smith and Delancy.**

First, the Majority Opinion asserts that this dissent engages in impermissible Monday-morning quarterbacking. In doing so, the Majority Opinion also raises questions about the efficacy of looking for Vixama's boyfriend. Maj. Op. at 43-45. This argument suffers from four problems.

First, it impermissibly places the burden of proof on Smith and Delancy. As the Majority Opinion correctly notes, the *government*—not the defendant—bears the burden of proof to show that it acted reasonably. Maj. Op. at 23 (citing *Roberts*, 448 U.S. at 74-75). And as the Majority Opinion further correctly acknowledges, although we can always think of more steps the government could have taken, the *government* can neutralize any intimation that reasonableness required those steps by showing the "great improbability that such efforts would have resulted in locating the witness." Maj. Op. at 30 (quoting *Roberts*, 448 U.S. at 75-76). So Smith and Delancy were not required to show that the boyfriend was a promising lead; rather, the government bore the burden of proving that finding the boyfriend was unlikely to lead to Vixama.

85

Yet the Majority Opinion ignores these rules and improperly places the burden of proof on Smith and Delancy, to show that Vixama would have been found if law enforcement had adequately followed up with the boyfriend.  For example, the Majority Opinion criticizes this dissent for "**surmis**[**ing**] that if the government had used databases, it *might* have found an address for the boyfriend in Delaware, and then it *might* have found Vixama."  Maj. Op. at 43 (bold added; italics in original).

Here, though, the government, which has the burden of proof, never gave any reason to doubt the efficacy of a database search.  Just the opposite.  When asked whether it had used databases to search for the boyfriend's address, the government's response was "[n]ot yet," suggesting the potential usefulness of the technique.

Nor did the government give any reason to doubt that Vixama was with her boyfriend.  In fact, Vixama's former attorney told the government she was, and the government even sent a subpoena to the boyfriend so Vixama would see it.  Only the Majority Opinion manufactures doubt about the likelihood and effectiveness of finding the boyfriend.  Then it improperly thrusts the burden of allaying that doubt on Delancy and Smith.

And the burden the Majority Opinion wrongly saddles Smith and Delancy with is also an impossible one for them:  law enforcement has unique access to tools and resources that are not available to Smith and Delancy.  For that reason, only law

86

enforcement can make the showing the Majority Opinion demands. Smith and Delancy cannot, for example, use law-enforcement databases to search for Vixama's boyfriend's address. So they have no way of removing the doubt the Majority Opinion creates about the efficacy of a database search. Ultimately, the Majority Opinion invents a problem the government never raised and drowns Smith and Delancy in an impossible burden that is not theirs.

Second, the Majority Opinion's argument depends in part on illogical reasoning. The Majority Opinion inexplicably concludes that because "efforts [to find Vixama] had already failed in Florida," they would also necessarily fail in Delaware. Maj. Op. at 46-47. This is irrational. First, if Vixama was not in South Florida, she was obviously somewhere else, and that somewhere else could have included Delaware. And second, more significantly, unlike the outdated information concerning whether Vixama was at the uncle's address, the government had current information from Vixama's former attorney that Vixama was in Delaware with the boyfriend. To suggest that one failure necessarily means failure forever—regardless of the different circumstances—is like assuming 7-Eleven won't have Snickers bars just because the library doesn't.

Third, in support of its argument, the Majority Opinion opines that following up with the boyfriend would have been a difficult and involved process. *See* Maj. Op. at 47-48. Not so. No matter how much the Majority Opinion draws out and

87

exaggerates the steps it would have taken for law enforcement to look up the boyfriend's address and follow up with him, the reality is that this is a routine and feasible technique that law enforcement uses all the time—analogous, as the Majority Opinion recognized, to looking up and going to Vixama's uncle's address (which was one of the very first things law enforcement did in this case).

Fourth, as for the concept of "Monday-morning quarterbacking," I agree that a court, with the benefit of hindsight, should not be unreasonably demanding. Maj. Op. at 44-45. I likewise agree that the "Sixth Amendment does not require the prosecution to exhaust every possible means of producing a witness at trial." Maj. Op. at 51. But our aversion against Monday-morning quarterbacking does not mean that we never review what the government did. And that the Sixth Amendment does not require the prosecution to take every conceivable step to find a witness is not a talismanic phrase to excuse inadequate efforts. Those two points carry weight only when it is unreasonable to demand more of the government.

Here, the government presented Vixama's recorded testimony in a trial that carried potential maximum sentences of decades in prison for Smith and Delancy. But the government's efforts to follow up on a fresh, promising opportunity to secure the defendants' Sixth Amendment right to the witness's presence at trial essentially consisted of only two calls and a text—even though other reasonable means to find

88

the boyfriend were readily available and inexpensive to undertake.  The Sixth Amendment demands more.

**(2) That it was reasonable for the prosecution to ask ERO for help does not excuse the prosecution's failure to take other reasonable steps to find Vixama.**

Moving on to the Majority Opinion's second justification for why the government's efforts here were reasonable, the Majority Opinion says that the government was "plainly reasonable" in asking ERO for help.  Maj. Op. at 46.  I don't disagree.  But taking one reasonable step is not enough when that step fails and other reasonable avenues for finding the witness emerge.  Here, the case agent's reasons for not doing more once he learned that ERO was not going to look for Vixama—because the government already had her deposition testimony and because he thought he "could have been turned down" had he asked for help—were not reasonable.  So the government's request for ERO's assistance did not relieve the government of its obligation through the end of the trial in April to engage in additional efforts to find Vixama when ERO came up short in February.

**(3) That the government initially hoped Vixama's former attorney could produce Vixama does not mean that, when that hope dissipated, the government could decline to take reasonable steps to follow up on a promising lead.**

As its third rationale, the Majority Opinion asserts that "[b]ecause it appeared that the boyfriend (and Vixama through him) was cooperating with attorney Raben, it was reasonable for the government to rely on attorney Raben to communicate with

89

him rather than to try to track the boyfriend down independently through databases." Maj. Op. at 49-50. I agree that the government was right to contact Vixama's former attorney. But when it became clear that the government's earlier communications with the attorney were unlikely by themselves to result in Vixama's presence at trial, and other promising leads for finding Vixama remained, the government did not have the discretion under the Sixth Amendment to refuse to engage in reasonable efforts to locate Vixama just because it had previously contacted her former attorney.

The government knew very quickly that it was not reasonable to assume, based solely on its communications with the attorney, that Vixama would show up for trial; from the very beginning, the boyfriend had not responded to the government. That's why the government noted on the very first day of trial that it anticipated Vixama would be "unavailable"—just two days after the attorney gave the government the boyfriend's phone number. If the government thought the attorney's earlier communications with Vixama would yield her appearance at trial, it obviously would not have made this announcement.

Despite the government's knowledge that Vixama probably would not comply with the subpoena, it did no more before trial than once call and once text Vixama's boyfriend—its current, promising lead. It declined to take basic, inexpensive, and obvious law-enforcement steps like running a database search. And when, just as

90

the government had anticipated, Vixama indeed failed to appear, the government did almost nothing to try to execute the bench warrant it obtained for her.

So while the Majority Opinion is right that it was reasonable for the government to initially rely on Vixama's former attorney, that did not excuse the government's subsequent unreasonable lack of action.

**(4) It is logical to conclude that Vixama's boyfriend was such an important lead that, to adequately follow up with him, the government should have done more than just ask someone to forward a subpoena to him.**

Fourth, contrary to the Majority Opinion's suggestion, it is not internally inconsistent for this dissent to emphasize the need to adequately follow up with Vixama's boyfriend while also asserting that the government's efforts in sending the subpoena to the boyfriend through Vixama's former attorney were insufficient under the circumstances. Maj. Op. at 50-51. To be sure, as I have noted, the government was right to try to find Vixama through her former attorney and even to try to send her a subpoena in that way.

But when that effort failed to yield Vixama's cooperation, the government could not just rest on its laurels. Rather, as I have explained, the government believed the boyfriend provided Vixama with the subpoena because it believed Vixama was with the boyfriend. As a result, the government had reason to believe that if it found the boyfriend, it would find Vixama. And that required the government to engage in reasonable efforts to find the boyfriend. *See supra* at 79.

91

**(5) How robust a previous cross-examination is and what state of mind the parties had during that cross-examination are irrelevant to determining unavailability.**

Fifth, while paying lip service to the notion that "[f]or sure, the defendants have not waived their Confrontation Clause claims," the Majority Opinion wrongly dismisses the unavailability requirement's independent importance, stressing that defense counsel "cross-examined Vixama as if she were testifying at trial because everyone assumed this would be her testimony at trial," and that this fact is "relevant and important" in assessing the reasonableness of the government's actions. Maj. Op. at 53. This justification for excusing the government's less-than-reasonable efforts to find Vixama misses the point of the Confrontation Clause's *independent* right to the witness's presence—a right that is separate from the right to cross-examination. *See supra* at 65-66. If robust cross-examination were enough to excuse the government from engaging in reasonable efforts to present a witness at trial, the Supreme Court would not have explained that admission of recorded testimony requires two separate showings: unavailability *and* cross-examination. *See Crawford*, 541 U.S. at 59.

The Majority Opinion's reliance on cross-examination to lower the reasonableness bar of the Sixth Amendment's right to the witness's presence at trial impermissibly conflates these requirements. It fails to recognize that the witness's live testimony at trial serves purposes that cross-examination alone simply cannot.

92

Perhaps for this reason, the Supreme Court has never excused the government from undertaking reasonable efforts to find a missing witness simply because the preserved testimony included thorough cross-examination. Nor does the Majority Opinion point to a single case where any other court has concluded that thorough cross-examination can somehow relieve the government of its obligation under the Sixth Amendment to engage in reasonable efforts to find a witness before it may present that witness's recorded testimony.

> **(6) That a witness may not want to be found does not relieve the government of its responsibility to take reasonable actions to find the witness.**

Sixth, the Majority Opinion repeatedly emphasizes that Vixama "was in hiding, and had a strong incentive not to be found." Maj. Op. at 16, 30. But evasiveness is not unavailability, and law enforcement cannot create a self-fulfilling prophecy by abbreviating search efforts just because the witness does not want to be found. *See Lynch*, 499 F.2d at 1024 ("We are not prepared to equate 'unavailability' with 'evasiveness.' The government failed to establish that [the witness] could not have been located and brought to trial by a reasonably diligent search. Accordingly we hold that the witness was not 'unavailable' . . . ."). Many witnesses would prefer not to be hauled into court. That's often the very reason why the government must undertake efforts to find them in the first place. So allowing a witness's evasiveness

93

to excuse unreasonable government efforts to find that witness would essentially render meaningless the Confrontation Clause's unavailability requirement.

(7) **The Majority Opinion's ruling runs squarely against the caselaw.**

Finally, the Majority Opinion suggests that caselaw supports the conclusion that the government's efforts here were "reasonable." Most respectfully, I disagree. The Majority Opinion's caselaw errors fall into three categories: (1) it does not heed the lessons of *Hardy* and *Roberts*; (2) it does not account for important Sixth Amendment-specific caselaw on "reasonableness;" and (3) it mistakenly concludes that *United States v. Tirado-Tirado*, 563 F.3d 117 (5th Cir. 2009), bolsters the determination that the government's efforts here were "reasonable." I address each error in turn below.

First, the Majority Opinion repeatedly relies on *Hardy* for the proposition that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." Maj. Op. at 23, 42 (quoting *Hardy*, 565 U.S. at 71-72). I take no issue with *Hardy*'s statement in that regard. But as I have explained, that is not the beginning and end of *Hardy*'s significance. As expressed in its reasoning and alluded to in the last phrase of the sentence quoted above, *Hardy* teaches that the government must undertake reasonable efforts to follow up on leads it does have "reason to believe" might be fruitful in locating a missing witness. *See Hardy*, 565 U.S. at 71-72; *see also supra* at 67-69.

94

*Roberts* supports this same lesson.  There, about a year before the trial, the missing witness's parents were able to reach the witness through information a social worker in San Francisco had provided, since at the time, the social worker was in communication with the parents about a welfare application the witness had filed. *Roberts*, 448 U.S. at 60.  After that time, though, the witness had called her parents only once and had not been in touch with her siblings.  *Id.*  During that last phone call, which occurred about seven or eight months before trial, the witness told her parents that she "was traveling" outside Ohio, but she did not advise them of where she was.  *Id.*  The witness's mother attested that she knew of no way to reach the witness, even in case of emergency, and that she did not "know of anybody who knows where she is." *Id.* (citation and quotation marks omitted).

As for the government's efforts to find the missing witness, it contacted the mother four months before trial and sent five subpoenas over time to the witness at the parents' address.  *Id.* at 75.  The government further noted that the witness's parents had "not been able to locate her for over a year." *Id.*

Based on these facts, the trial court declared the witness unavailable and admitted the witness's prior testimony. *Id.* at 59.  The defendant was convicted and appealed, asserting that the use of the prior testimony violated his Sixth Amendment rights. *Id.*

95

The Supreme Court agreed with the trial court's decision. *Id.* at 76. In reaching this conclusion, significantly, the Supreme Court explained that "the great improbability that [additional] efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Id.* Immediately following that statement, the Court reaffirmed the "general rule" that "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Id.* (citation and quotation marks omitted). In other words, under the particular circumstances in *Roberts*, there was no reason to believe that additional efforts would have located the witness. But when reason to believe additional reasonable efforts may be successful exists, the government must engage in those efforts.

The Majority Opinion completely misses this lesson from *Hardy* and *Roberts*. Instead, it inaccurately accuses this dissent of cherry-picking phrases out of context. *Compare* Maj. Op. at 37 (accusing this dissent of cherry-picking phrases out of context), *with supra* at 67-69 (explaining relevant facts in *Hardy*), *and supra* at 93-95 (explaining relevant facts in *Roberts*). Then the Majority Opinion single-mindedly focuses on articulating undisputed points, entirely failing to analyze the important principles of the cases. For example, the Majority Opinion notes that in *Hardy*, the Supreme Court excused the prosecution's failure to reach out to the missing witness's boyfriend or the cosmetology school where she had been enrolled

96

because there was no "reason to believe" those leads would have been fruitful.  Maj. Op. at 42 (quoting *Hardy*, 565 U.S. at 71).  But remarkably, the Majority Opinion then fails to engage with the fact that, in this case, there *was* reason to believe that Vixama was with her boyfriend.

Similarly, the Majority Opinion explains that in *Roberts*, the trail had effectively gone cold for the missing witness:  the government's most recent information about the witness's whereabouts was seven-to-eight months old, and the government knew only generally that the witness was, at that time, traveling outside Ohio.  Maj. Op. at 38-39.  That's why the Supreme Court opined that it was "great[ly] improbab[le]" that further government efforts would yield the missing witness.

Again, though, the Majority Opinion fails to register the significance in Smith and Delancy's case that it was not "great[ly] improbab[le]" that additional government efforts would be useful.  As I have noted, the government here believed—and had good reason to believe—based on Vixama's former attorney's representations, that Vixama was physically present with the boyfriend in Delaware.

Had the Majority Opinion actually applied the reasoning of *Hardy* and *Roberts* here, it necessarily would have reached the conclusion that the government

97

did not undertake reasonable efforts to follow up on the promising lead that was Vixama's boyfriend.[10]

The Majority Opinion makes its second significant mistake relating to caselaw when it does not account for important Sixth Amendment-specific caselaw on "reasonableness." In explaining the "reasonableness" standard, the Majority Opinion relies heavily on Fourth Amendment jurisprudence. *See* Maj. Op. at 25-26 & n.7 (citing *United States v. Banks*, 540 U.S. 31, 36 (2003); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Ker v. California*, 374 U.S. 23, 33 (1963); *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *Missouri v. McNeely*, 569 U.S. 141, 150 (2013); *Stephens v. DeGiovanni*, 852 F.3d 1298, 1315 (11th Cir. 2017); *Rodriguez v. Farrell*, 280 F.3d 1341, 1346-47 (11th Cir. 2002)).[11] And while Fourth Amendment caselaw can be helpful to understanding the meaning of "reasonableness," Sixth Amendment jurisprudence has put its own unique twist on the "reasonableness" inquiry—a twist that Fourth Amendment jurisprudence does not account for.

---

[10] *Hardy* and *Roberts* are not the only cases the Majority Opinion summarizes for what seems like little purpose. In a single sentence and a footnote consisting of citations, this dissent relies on precedent from our sister Circuits for the point that other courts have looked, as a measure of reasonableness, to whether the prosecution's efforts match those it would have undertaken had it lacked the missing witness's testimony. *See supra* at 75-76 & n.29. In response, the Majority Opinion spends pages laboriously summarizing the cited cases. Maj. Op. at 55-59. When the dust settles, though, the Majority Opinion does not contest the point of citing the cases in the first place: that a factor courts can consider is whether the government tried as hard to look for the missing witness as it would have if it did not already possess what it needed from that witness.

[11] All of these cases concern the Fourth Amendment.

For example, significantly, the Supreme Court has explained that, in the Confrontation Clause context, the Framers "were loath to leave too much discretion in judicial hands" and that "open-ended balancing tests" are disfavored because "[v]ague standards are manipulable." *Crawford*, 541 U.S. at 67-68. So it is not surprising that Sixth Amendment jurisprudence provides guidelines—like the government need not engage in futile search efforts; it may need to perform actions that have a possibility of finding a witness; and it must perform reasonable tasks that it has reason to believe might be successful—that assist us in determining whether law enforcement's efforts were "reasonable." *See*, *e.g.*, *Roberts*, 448 U.S. at 74; *Hardy*, 565 U.S. at 71.

To be sure, the Majority Opinion mentions the cases that give us these rules. But it ignores the Sixth Amendment-specific instruction to avoid "open-ended balancing tests." Instead, the Majority Opinion relies on Fourth Amendment law to justify its touchy-feely, I-know-it-when-I-see-it approach to determining whether the government's efforts to find a witness were reasonable. And as I have noted, even when the Majority Opinion pays lip service to the Sixth Amendment-specific rules on reasonableness, it ignores many of the rules most important to this case. As a result, the Majority Opinion fails to recognize the insufficiency of the government's actions here.

99

Finally, the Majority Opinion makes a third caselaw-related mistake when it asserts that *Tirado-Tirado* "demonstrates why the government has shown a good-faith, reasonable effort here." *See* Maj. Op. at 59. In fact, *Tirado-Tirado* compels the opposite conclusion—that the government's actions here did not satisfy its reasonableness obligation. The Majority Opinion's view to the contrary results from two errors.

First, the Majority Opinion notes that the *Tirado-Tirado* witness's deposition was taken "only as a precaution" because the government expected the witness to return to the United States to testify at trial. *Id.* at 60. But to the extent this discussion suggests that the reason it was wrong in *Tirado-Tirado* to present the missing witness's testimony was because Tirado-Tirado may have foregone more rigorous cross-examination of the witness in anticipation that the witness would appear again at trial, *Tirado-Tirado* expressly nixed that idea. *Tirado-Tirado* explained that the use of the deposition testimony at trial violated the Confrontation Clause "not because Tirado-Tirado did not have a full and fair opportunity to cross examine [the witness]"—indeed, the Fifth Circuit found he did—but because "[the witness] was not 'unavailable' for trial." *Tirado-Tirado*, 563 F.3d at 125-26. As I have noted, the right to the witness's presence at trial and the right to cross-examination are distinct rights that protect the defendant in different ways. *See supra* at 65-66. Once again, the Majority Opinion improperly conflates these rights.

100

Second, the Majority Opinion tries to distinguish *Tirado-Tirado*, emphasizing that "in *Tirado-Tirado*, the government 'made no effort' whatsoever to keep in touch with the alien witness" until about eight days before trial. Maj. Op. at 61 (citing *Tirado-Tirado*, 563 F.3d at 125). But what we have here, the Majority Opinion asserts, "is not a case in which the government 'made absolutely no effort' to locate Vixama and obtain her presence at trial." *Id*. These statements are true, as far as they go. But they are misleadingly incomplete, since the Majority Opinion focuses on only the government's efforts in the months before trial and glosses over the comparison of the government's efforts in each case in the several days immediately prior to trial.

In *Tirado-Tirado*, as the Majority Opinion notes, the government took no action to remain in contact with the witness in Mexico for five months, waiting until eight days before trial to act. *Tirado-Tirado*, 563 F.3d at 124. And as the Majority Opinion correctly notes, the government here did undertake some action in the two months prior to its last-minute activities five days before trial—it asked ERO to go to the uncle's house. So yes, we have this modest distinction.

But in the eight days before trial, when the government finally began its efforts to obtain the witness's presence at trial in *Tirado-Tirado*, the government sent the witness a letter with explicit instructions concerning arrangements for the witness to testify and be reimbursed; spoke to the witness's brother about the witness's

101

attendance; obtained the name and telephone number of Tirado-Tirado's common-law wife in the United States; examined the call log of Tirado-Tirado's seized phone for calls to the witness; subpoenaed Western Union for transactions made in Tirado-Tirado's name that could relate to the witness, after discovering in Tirado-Tirado's phone log a call made to Western Union; and reviewed immigration and criminal records for the witness—all in an effort to find the witness. *Id.* at 120. Even after doing all this, when the government could not come up with the witness, the *Tirado-Tirado* Court decided that the government had not done enough overall. *Id.* at 125.

Here, in contrast, the government did little to follow up on the leads it had: it did not revisit the uncle's home, even though the agent believed as late as within a week of trial that Vixama was "perhaps" there; it did not run Vixama's boyfriend's name or number through any database; and it did not attempt to send an agent to find Vixama's boyfriend, even though doing any—or all—of these things to follow up on fresh leads would not have required significant government resources.

Thus, the real distinguishing feature between *Tirado-Tirado* and this case is how much more overall the government did in *Tirado-Tirado* to locate a witness outside the country than it did in this case to locate one inside the country—a distinction that especially dooms the sufficiency of the government's efforts here.[12]

---

[12] When a foreign-national witness is happily located outside the United States, the United States generally has no options to obtain that witness's appearance at trial other than a request to appear with a promise to pay for travel. But when a witness is physically present in the United

**IV.**

Since the government's efforts here were unreasonable and Vixama's testimony should not have been admitted, we must consider whether admitting Vixama's deposition testimony was harmless error. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). A Confrontation Clause violation is harmless only if we can say beyond a reasonable doubt that the error did not contribute to the verdict. *United States v. Gari*, 572 F.3d 1352, 1362 (11th Cir. 2009). In contemplating this issue, we consider the importance of the witness's testimony, whether the testimony is cumulative, whether evidence corroborates or contradicts the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684. We ask whether the average juror would find the prosecution's case less persuasive without the erroneously admitted testimony. *Gari*, 572 F.3d at 1363.

Here, the admission of the deposition testimony was not harmless. Even the Majority Opinion does not argue that it was.

Indeed, although the Majority Opinion asserts that "there was compelling evidence that the defendants' boat was headed to the United States," Maj. Op. at 57,

---

States, the government has various law-enforcement options available to it to produce the witness at trial. For this reason, and as the Majority Opinion recognizes, cases involving foreign-national witnesses happily residing outside the United States—such as *United States v. Siddiqui*, 235 F.3d 1318 (11th Cir. 2000), discussed by the Majority Opinion at 24 & n.6—are not helpful in identifying the types of steps the government must engage in to satisfy the unavailability requirement when the witness is physically located here.

conspicuously absent from that Opinion is an alternative holding that even if the district court erred in admitting Vixama's testimony, the error was harmless. And for good reason: Vixama's testimony provided the clearest, non-circumstantial evidence that the boat was bound for the United States. Specifically, she testified in her deposition that her mother's friend had arranged for her to be smuggled into Miami for $5,000 and that she understood the boat was going from Freeport directly to Miami.

Aside from the unclear and confusing deposition testimony of Davidson Francois, another material witness, the government presented no other direct evidence that the boat's intended destination was the United States.[13] Rather, the other evidence on which the government relied for this necessary element of the crime was entirely circumstantial: that the migrants were told to turn off their cell phones for the trip and to not wave down other vessels once their boat stalled; that none aboard were legally authorized to be in the United States and lacked identification documents; and that Smith's explanation for the boat's track did not make sense. Certainly, these facts are more than sufficient to suggest an illegal operation and even a human-smuggling scheme. But they do not demand or even

---

[13] At some points in his deposition, Francois seemed to suggest that he was heading to the United States, but Francois's testimony was unclear at best. Significantly, as the Majority Opinion notes, he also testified that he did not personally know where the boat was going. Maj. Op. at 5-6.

104

reasonably support the inference that the boat was United States-bound.  Even the case agent agreed in his testimony that Vixama was an "essential" witness. Particularly in view of where the boat was intercepted, I cannot conclude beyond a reasonable doubt that Vixama's testimony did not contribute to the jury's conclusion that the boat was headed for the United States.  As a result, the Confrontation Clause violation was not harmless and requires vacatur of the judgment and remand.

## V.

To protect Smith's and Delancy's Sixth Amendment right to confront Vixama, the government was required to engage in reasonable efforts to produce Vixama at trial.  But the government failed to do so.  Among other deficiencies, though the government had good reason to believe that Vixama was physically present with her boyfriend, it did almost nothing to locate the boyfriend—even though it had the boyfriend's phone number and knew he lived in Delaware. Following up on the boyfriend's location would have involved routine, inexpensive law-enforcement techniques such as searching databases or running basic internet searches and sending an agent out to follow up on any resulting leads.  Because the government did not engage in these standard and reasonable efforts to follow up on its promising lead, it did not satisfy the Sixth Amendment's unavailability requirement before presenting Vixama's recorded testimony.  As a result, Smith's and Delancy's Sixth Amendment right to the witness's presence was violated.  And

105

since that was not harmless error on this record, the judgment should be vacated and

the case remanded.  I therefore respectfully dissent.